Filed 8/28/14

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| TAYLOR PATTERSON, | ) | |
| | ) | |
| Plaintiff and Appellant, | ) | |
| | ) | S204543 |
| v. | ) | |
| | ) | Ct.App. 2/6 B235099 |
| DOMINO'S PIZZA, LLC, et al., | ) | |
| | ) | Ventura County |
| Defendants and Respondents. | ) | Super. Ct. No. |
| | ) | 56-2009-00347668-CU-OE-SIM |
| _____ | ) | |

Franchising, especially in the fast-food industry, has become a ubiquitous, lucrative, and thriving business model. This contractual arrangement benefits both parties. The franchisor, which sells the right to use its trademark and comprehensive business plan, can expand its enterprise while avoiding the risk and cost of running its own stores. The other party, the franchisee, independently owns, runs, and staffs the retail outlet that sells goods under the franchisor's name. By following the standards used by all stores in the same chain, the self-motivated franchisee profits from the expertise, goodwill, and reputation of the franchisor.

In the present case, a male supervisor employed by a franchisee allegedly subjected a female subordinate to sexual harassment while they worked together at the franchisee's pizza store. The victim, who is the plaintiff herein, sued the *franchisor*, along with the harasser and franchisee. The plaintiff claimed that because the franchisor was the "employer" of persons working for the franchisee,

1

and because the franchisee was the "agent" of the franchisor, the latter could be held vicariously liable for the harasser's alleged breach of statutory and tort law.

The trial court granted summary judgment for the franchisor on the ground the requisite employment and agency relationships did not exist. The Court of Appeal disagreed, and reversed the judgment of the trial court.

We granted review to address the novel question dividing the lower courts in this case: Does a franchisor stand in an employment or agency relationship with the franchisee and its employees for purposes of holding it vicariously liable for workplace injuries allegedly inflicted by one employee of a franchisee while supervising another employee of the franchisee? The answer lies in the inherent nature of the franchise relationship itself.

Over the past 50 years, the Courts of Appeal, using traditional "agency" terminology, have reached various results on whether a franchisor should be held liable for torts committed by a franchisee or its employees in the course of the franchisee's business. In analyzing these questions, the appellate courts have focused on the degree to which a particular franchisor exercised general "control" over the "means and manner" of the franchisee's operations.

Meanwhile, franchising has seen massive growth. A franchisor, which can have thousands of stores located far apart, imposes comprehensive and meticulous standards for marketing its trademarked brand and operating its franchises in a uniform way. To this extent, the franchisor controls the enterprise. However, the franchisee retains autonomy as a manager and employer. It is the franchisee who implements the operational standards on a day-to-day basis, hires and fires store employees, and regulates workplace behavior.

Analysis of the franchise relationship for vicarious liability purposes must accommodate these contemporary realities. The imposition and enforcement of a uniform marketing and operational plan cannot *automatically* saddle the franchisor

2

with responsibility for employees of the franchisee who injure each other on the job. The contract-based operational division that otherwise exists between the franchisor and the franchisee would be violated by holding the franchisor accountable for misdeeds committed by employees who are under the direct supervision of the franchisee, and over whom the franchisor has no contractual or operational control. It follows that potential liability on the theories pled here requires that the franchisor exhibit the traditionally understood characteristics of an "employer" or "principal;" i.e., it has retained or assumed a general right of control over factors such as hiring, direction, supervision, discipline, discharge, and relevant day-to-day aspects of the workplace behavior of the franchisee's employees. (See *Vernon v. State of California* (2004) 116 Cal.App.4th 114, 124 (*Vernon*) [considering "the 'totality of circumstances' that reflect upon the nature of the work relationship of the parties"].)

Here, the franchisor prescribed standards and procedures involving pizza-making and delivery, general store operations, and brand image. These standards were vigorously enforced through representatives of the franchisor who inspected franchised stores. However, there was considerable, essentially uncontradicted evidence that the *franchisee* made day-to-day decisions involving the hiring, supervision, and disciplining of his employees. Plaintiff herself testified that after the franchisee hired her, she followed his policy, and reported the alleged sexual harassment to him. The franchisee suspended the offender. Nothing contractually required or allowed the franchisor to intrude on this process.

Plaintiff highlights the franchisee's testimony that a representative of the franchisor said the harasser should be fired. But, consistent with the trial court's ruling below, any inference that this statement represented franchisor "control" over discipline for sexual harassment complaints cannot reasonably be drawn from the evidence. The uncontradicted evidence showed that the franchisee imposed

3

discipline consistent with his own personnel policies, declined to follow the ad hoc advice of the franchisor's representative, and neither expected nor sustained any sanction for doing so.

For these reasons, we will reverse the Court of Appeal's decision overturning the grant of summary judgment in the franchisor's favor.

## I.  PROCEDURAL BACKGROUND

### A.  The Parties

In September 2008, a company named Sui Juris, LLC (Sui Juris or the franchisee), acquired an existing Domino's pizza franchise in Southern California. The franchise agreement was signed for Sui Juris by its sole owner, Daniel Poff (Poff).  The other contracting party was Domino's Pizza Franchising, LLC, which was related to both Domino's Pizza, Inc., and Domino's Pizza, LLC (collectively, Domino's or the franchisor).

When operations began, Sui Juris retained, as its employees, the 17 or 18 people who already staffed the store.  One of them was Renee Miranda (Miranda), an adult male who held the title of assistant manager.

In November 2008, a young woman named Taylor Patterson (Patterson) was hired to serve customers at the Sui Juris store.  Her job soon ended under circumstances set forth in the pleadings, which we now describe.

### B.  The Complaint

In June 2009, Patterson filed this action against Miranda, Sui Juris, and Domino's.  She alleged the following facts:  Miranda worked as a manager at the Sui Juris store.  He sexually harassed her whenever they shared the same shift.  He made lewd comments and gestures, and grabbed her breasts and buttocks.  After Miranda refused to stop, Patterson reported the problem to her father and to Poff.

The complaint continued:  Patterson's father contacted the police.  He also called Domino's "corporate office," and told someone in the human resources

4

department about the sexual harassment his daughter had endured at the Sui Juris store. Patterson stayed away from work for one week, and then returned. She soon resigned. She perceived that her hours were reduced because she had reported Miranda's misconduct to others.

The complaint stated several causes of action. The first three counts invoked the Fair Employment and Housing Act (FEHA), and alleged sexual harassment, failure to take reasonable steps to avoid harassment, and retaliation for reporting harassment. (See Gov. Code, § 12900 et seq.)[1] Otherwise, the complaint asserted common law counts for intentional infliction of emotional distress, assault and battery, and constructive termination against public policy under FEHA. Compensatory and punitive damages were sought.

Critical here is Patterson's portrayal of the legal relationship between Domino's and the employees of Sui Juris. As to all causes of action, the complaint maintained that Domino's was the "employer" of both Patterson and Miranda, and that they were the "employee[s]" of Domino's. Each defendant was described as "the agent, employee, servant and joint venturer" of the other defendants. At all relevant times, the defendants purportedly acted "within the course, scope and authority of such agency, employment and joint venture, and with the consent and permission of" the other defendants. Also, it was alleged that the officers and/or managing agents of every defendant "ratified and approved" all actions of the other defendants.

### C. Summary Judgment Motion

In November 2010, Domino's sought summary judgment, or, alternatively, summary adjudication, against Patterson. Responding to allegations in the

---

[1] All further statutory references are to the Government Code except as otherwise stated.

complaint, Domino's argued that it was not an "employer" or "principal," and could not be held vicariously liable for Miranda's misconduct as a result. Domino's acknowledged that it imposed and enforced broad standards for selling its trademarked pizza brand. That way, customers expected and received a similar experience each time they patronized any franchised store. Domino's maintained, however, that Sui Juris was a separate business run by Poff, and that he selected, managed, and disciplined his employees. Hence, Domino's claimed, the internal day-to-day control needed for an employment or agency relationship was lacking.

### D. Evidence Supporting Summary Judgment

Domino's submitted excerpts from its franchise agreement with Sui Juris. Domino's also provided: (1) a declaration by Joseph P. Devereaux (Devereaux), Domino's director of franchise services, (2) excerpts from the deposition of Poff, who owned Sui Juris, and (3) excerpts from the deposition of Patterson, the plaintiff. We now review this evidence.

**1. Franchise Relationship.** According to both Devereaux and Poff, Domino's and Sui Juris had distinct legal identities and corporate structures. Neither business held any ownership or partnership stake in the other, and they had no officers or directors in common. Domino's had no access to Sui Juris's bank accounts. Sui Juris filed its own tax returns. It also obtained all necessary business licenses and operating permits. While Sui Juris paid Domino's a royalty fee and other miscellaneous costs, the two companies did not otherwise share profits or losses. Under the franchise contract, Sui Juris maintained property and liability insurance at its own expense.

**2. Hiring.** The franchise contract stated that Sui Juris was "solely responsible" for "recruiting [and] hiring" employees to operate its store. Those persons, the contract said, "shall be [Sui Juris's] employees, and not [Domino's] agents or employees." Consistent with these terms, Poff testified that he received

6

and retained applications directly from job candidates, and that he never sent or showed those documents to Domino's. Poff also personally interviewed all applicants. Domino's did not participate in any job interviews. Poff explained that he deliberately excluded Domino's from the hiring process. The reason was that the decision was his alone to make, and that no input or oversight was required on Domino's part.

Patterson's employment with Sui Juris reflected the foregoing policy and practice. Patterson, like Poff, testified that in November 2008 she walked into the Sui Juris store, and asked for a job application. She was interviewed by Poff. In Patterson's words, Poff hired her "on the spot."

**3. Training.** Under the contract, Poff, as Sui Juris's sole owner, promised to personally undergo training with Domino's as a condition of opening and operating his store. Domino's reserved the option of requesting supplemental training on Poff's part at his own expense.

Otherwise, the contract removed from Domino's any right or duty to "implement a training program for [Sui Juris's] employees," or to "instruct [them] about matters of safety and security in the Store or delivery service area." Poff, in turn, agreed to be "solely responsible" for implementing programs to train his employees on the legal, safe, and proper performance of their jobs. Such was the case even if Poff obtained "advice or suggestions" from Domino's on the matter. The contract precluded him from employing untrained or unqualified persons.

Poff testified that when he first opened the Sui Juris store, he received guidance over three days from Claudia Lee (Lee), an "area leader" for Domino's. She "did nothing" to help him train his employees. Poff personally trained newly hired employees himself. However, Domino's provided an orientation program for new employees on the store's computer system, i.e., the "PULSE" system. Those programs covered pizza-making, store operations, safety and security, and

7

driving instructions.  The PULSE training program was accompanied by a Domino's handbook.[2]

Regarding sexual harassment training for his employees, Poff was "not sure" that Domino's covered this topic in its PULSE programs.  Poff answered "no" in his deposition when asked if "anybody from Domino's . . . provide[d] sexual harassment training to [his] employees." [3]

Instead, Poff implemented his own (i.e., "my") sexual harassment policy. Poff explained that his policy involved "zero tolerance" and the "reasonable woman standard."  Store managers received such instruction during multiple meetings with Poff.  He told them to contact him if an issue or question arose. Nonmanagerial employees received some sexual harassment information as well. Poff placed his policy on the PULSE system.  In her deposition, Patterson gave this additional account:  "When [Poff] had first hired me, [he said] that it was a big thing to him, sexual harassment; and that if it had happened, that he would want me to contact him right away."

---

[2]    Poff and other witnesses described the PULSE computer system as a comprehensive sales and accounting program that Domino's required franchisees to buy and use in their stores.  Domino's could access the system in order to track certain sales, such as those involving product promotions and repeat customers. The program also contained employee information that franchisees could use to prepare work schedules and payroll documents.

[3]    Elsewhere in his deposition (in excerpts that Patterson provided) Poff testified that he "believe[d]" *he* had received sexual harassment training from Domino's when he first became a franchisee.  However, he could not recall any "specifics."  As we discuss further below, Patterson also submitted excerpts from the deposition of Devereaux, who headed franchise services for Domino's. Devereaux indicated that new franchisees received sexual harassment training, but he did not know what it entailed.

**4. Supervision.** The franchise contract required the Sui Juris store to "at all times be under the direct, on-premises supervision" of Poff. He agreed to function as a full-time "manager," and not to engage in other business endeavors without first obtaining Domino's written consent.

The contract stated that persons who worked in the store were Sui Juris's employees "and not [Domino's] agents or employees." Some of the managerial tasks over which Poff assumed control included "scheduling for work, supervising[,] and paying" his employees. Domino's disclaimed any right or duty to "operate the Store" or to "direct [Sui Juris's] employees" in their jobs. Those functions were made Poff's sole responsibility.

Patterson testified that she was supervised at work either by Poff or by one of his managers or assistant managers, including Miranda. Poff testified that Patterson and Miranda were on the payroll of Sui Juris.[4]

**5. Alleged harassment and subsequent events.** Testimony by Patterson described the following chain of events: Miranda began sexually harassing Patterson at work shortly after Poff hired her. Two weeks later, she complained to her father and to Poff. Patterson spoke to Poff about the matter on a second unspecified occasion. At that time, according to Patterson, Poff said he was "going to fire" Miranda. The police were called. Miranda was apparently arrested and taken into custody.

---

**4**     Our record contains a few lines of incomplete testimony about "writ[ing] up" employees who violated company policy at the Sui Juris store. Poff testified that he performed this task "[m]ost of the time," and that Domino's never asked him to present any writeup to his employees on its behalf. It is not clear what a writeup entailed, what consequences ensued, or who could impose them.

Poff testified that, in actuality, he "suspended" Miranda "pending an investigation" into Patterson's sexual harassment complaint. The results were inconclusive, because Poff lacked the resources to satisfactorily complete the task. The problem solved itself, Poff explained, when Miranda failed to show up for work. He "self-terminated," in Poff's view.[5]

Patterson testified that shortly after the foregoing events occurred, she quit her job. There was one week in which she was scheduled to work only three days, rather than four days. Patterson admitted, however, that she was never told she would always work a minimum of four days a week.

### E. Evidence in Opposition to Summary Judgment

Patterson disputed Domino's claim that it did not control Sui Juris's day-to-day operations, including employment matters. Hence, she asked the trial court to find a triable issue of fact in this regard. For support, Patterson relied primarily on the franchise documents and the role of Domino's area leaders.

**1. The contract.** Patterson submitted the full franchise contract. It contained relevant provisions not included in Domino's materials, as follows:

Sui Juris agreed to sell Domino's products at a specific site for a 10-year term, and to pay a royalty fee (calculated as a percentage of weekly sales) in exchange for the right to use the "Domino's System" and related trademarks. The bulk of the contract concerned the following topics: site construction; store refurbishing; equipment and furnishings; menus and pricing; advertising and promotions; reports and audits; computer systems and data access; trademark use and infringement; company inspections; contract termination; posttermination

---

[5] Poff testified that Miranda later returned and asked for his job back. He denied sexually harassing Patterson. Poff refused to rehire Miranda.

rights and procedures; and contract interpretation and enforcement. The contract also required compliance with a separate Managers Reference Guide (the MRG), which we describe below.

The contract described the parties as "independent contractors," regardless of any training or support on Domino's part. Domino's was not liable under the contract for "any damages to any person or property arising directly or indirectly out of the operation of the Store." The parties agreed that they had no "principal and agent" relationship. Domino's disclaimed "any relationship with [Sui Juris's] employees," and assumed "no rights, duties, or responsibilities" as to their employment. Other provisions made clear that Sui Juris had no authority "to act for or on [Domino's] behalf."

**2. The MRG.** Patterson submitted one section of the MRG. Most provisions were not employment related.[6] That said, managers and employees new to their jobs were to be trained with programs provided or approved by Domino's. Time cards and reports were expected. Domino's delivery drivers needed to meet minimum age and experience standards. Also, because employees were required to wear uniforms, the MRG set forth detailed clothing and accessory guidelines. Various grooming and hygiene standards were designed to promote

---

**6**     The MRG mostly covered the following matters: money management and security, including limits on workplace talk about cash or sales; customer deliveries and driver transportation; refuse disposal; sanitation and safety; food ingredients, preparation, and handling; store hours and daily closing procedures; phone systems and computer programs; promotional and other interior displays; customer payments and complaints; sales marketing and product packaging; leases and building construction; exterior and interior signage; utility services and kitchen equipment; and store inspections.

11

neatness and sanitation. Employees could not possess or consume alcohol or illicit drugs while working or on store premises. Tobacco use was limited.[7]

**3. Poff's deposition.** Patterson supplemented Domino's evidence by providing additional excerpts from Poff's deposition. Poff implied that he had little choice but to follow the advice of his area leader, Lee. He felt he always had to say "yes" to her, and he did not recall ever "intentionally" rejecting her suggestions. Poff assumed that a franchisee who did not "play ball" with the area leader might be "in jeopardy," "in trouble," or "out of business." Poff acknowledged, however, that area leaders like Lee simply "tried to be helpful" in monitoring implementation of the standards set forth in the contract and the MRG.

Poff testified that he did not see Lee often because her service area was large.[8] Other Domino's inspectors visited the store four times during the year Poff owned it. He recalled two occasions on which Domino's had used unidentified ("mystery") callers to assess operations.

Poff acknowledged that he adopted his own personnel policies. One of them was the sexual harassment policy. Others concerned attendance. For

---

**7** Patterson submitted other documentary evidence. Forms from 2008 and 2009 showed that Domino's inspectors had rated the Sui Juris store on customer orders, food preparation, product packaging, employee uniforms, and store cleanliness. Also, Domino's sent letters in 2009 about contractual problems unrelated to Patterson's sexual harassment complaint. Such matters concerned use of unapproved products, delivery outside territorial limits, failure to provide financial records, and nonpayment of royalties and other fees. We note that in July 2009, after Sui Juris was placed in default, its contract with Domino's was terminated. It appears Poff, who owned Sui Juris, then filed for bankruptcy.

**8** Lee testified in her deposition, which we describe below, that she visited Poff's store every two weeks while he owned the franchise. She also placed phone orders to check the quality of the food and service.

12

example, "if an employee did not show up and did not call after three times, . . . they had voluntarily . . . self-terminated from employment."

Poff confirmed that Miranda was an assistant manager who supervised other employees. At some unspecified point after Patterson told Poff about Miranda's sexual advances, Poff relayed the information to Lee. According to Poff, Lee mentioned that Patterson's father had called Domino's and complained about Miranda's alleged acts of sexual harassment.

In discussing the matter with Poff, Lee reportedly said, "You've got [to] get rid of this guy." Poff answered "no" in his deposition when asked whether Lee told him "what was going to happen to you if you didn't fire Miranda." Nor could he recall any specific implication in her remark. When asked whether he told Lee that he did not intend to fire Miranda, Poff said "no." The matter became a "nonissue" when Miranda "self-terminat[ed]."

Poff further testified that shortly after he first spoke with Lee about Patterson's complaint, Lee made a brief visit to the Sui Juris store. Lee expressed ongoing interest in the Patterson case. According to Poff, Lee asked whether he had training procedures and materials in place, and whether he would retrain his staff. Lee "made suggestions" in this regard. Poff testified that he was under pressure in running the business and meeting Domino's expectations at that time.

**4. Lee's deposition.** Patterson submitted excerpts from Lee's deposition. Lee testified that, in November 2008, when the alleged harassment occurred, she monitored 101 Domino's franchises for compliance with operational and marketing standards. When sales were low, she recommended changes in pricing and staffing levels. "But," Lee explained, "that's the franchisee's decision."

Lee described other tasks she performed, all of which prevented harm to Domino's brand and to its customers and employees. Lee would train franchisees when their doors first opened or when a new product was launched. Lee testified

13

that, while managers employed by the franchisees sometimes attended these sessions, the franchisees were responsible for training their employees. During regular store inspections, Lee would coach franchisees and employees on problems she saw with pizza-making, food safety, product packaging, store cleanliness, employee hygiene, customer orders, consumer complaints, and delivery procedures. Sometimes, franchisees were asked to temporarily close stores that had imminent safety hazards, like poor refrigeration or fire damage. Other times, Lee recommended that Domino's send a notice of default when stores did not follow procedures that were contractually required.

Regarding employees, if one of them was rude in Lee's presence, she would ask the franchisee to correct the problem. Lee testified that she was not involved in the hiring process. Nor was it her job to fire employees or demand that they be fired. On rare occasions, Lee encountered an employee whose performance was so deficient that it was hurting Domino's brand or endangering the franchise. Lee, at most, "recommended" or "suggested" to the franchisee that such employee might not be the right person for the job.[9]

---

**9** Lee was asked about a disciplinary matter at the Sui Juris store involving a manager named Dave Knight. Lee testified that she visited the store and saw that Knight was using Domino's bags to deliver non-Domino's food outside Poff's service area — acts which involved serious violations of Domino's rules. Knight also did not follow general operating procedures when he ran the store in Poff's absence. Lee told Poff that such conduct was hurting the franchise, and risked a contractual default. According to Lee, she did not tell Poff to fire Knight. Rather, she recommended that Knight not be placed "in charge of the store," or "left alone running the shift." Lee and Poff developed written guidelines, or an "action plan," setting forth the steps Poff would take to remedy Knight's misdeeds, including a description of the discipline Poff imposed upon him. Consistent with Lee's account, Poff testified that he ultimately fired Knight, i.e., "pull[ed] the trigger on the termination." Poff never testified that Lee told him to do so.

**5. Devereaux's deposition.** Patterson provided excerpts from Devereaux's deposition to supplement his declaration, which Domino's had included in its moving papers. Devereaux testified as follows: Domino's had 9,000 stores worldwide, only 500 of which were company owned. Domino's human resources department offered no guidance to franchisees on handling personnel issues. If a franchisee asked Domino's for such advice, the company would recommend that the franchisee resolve the situation himself or retain counsel to do so. A similar response was expected of any area leader asked to answer a sexual harassment question posed by a franchisee. Devereaux suggested that area leaders were neither compelled nor trained to handle such matters.

Devereaux indicated that Domino's had no procedure for processing sexual harassment complaints by employees of a franchisee. He testified that Domino's had a "1-800" telephone number for *customer* complaints about products and services. Devereaux understood that Patterson's father had called the customer complaint line to report the alleged sexual harassment of his daughter.[10]

Devereaux recalled one instance in which the franchisee himself (not an employee of the franchisee) had been personally accused of sexual harassment. That case was resolved when the franchisee was placed in default and required to undergo sexual harassment training. Devereaux could not rule out the possibility

---

[10] Devereaux testified that there was a procedure by which both franchise owners (e.g., Poff) and area leaders (e.g., Lee) received e-mails generated by calls to the 1-800 customer complaint line. According to both Devereaux and Lee, the area leader would then ask the franchise owner whether and how the matter reflected in the e-mail was handled. Lee further testified that serious matters were relayed to her by telephone, apparently on an ad hoc basis. For instance, she recalled that "someone" from Domino's called and said Miranda "was going to be arrested." She was "not sure exactly" how such information came to Domino's attention, and she did not know if "someone called the customer care line."

that a franchisee might undergo sexual harassment training if someone working in his store was accused of such misconduct.

### F.  Lower Court Rulings[11]

After a hearing, the trial court issued a lengthy statement of decision granting summary judgment for Domino's on all counts.  The court determined that Domino's did not control day-to-day operations or employment practices such that Sui Juris was an agent of Domino's, or that Miranda was an employee of Domino's.  In the court's view, Domino's operating standards protected brand identity and integrity, and excluded hiring, firing, and other personnel matters.  The court found no significance in Lee's statement that Poff should fire Miranda, because it was an offhand remark that Poff ignored.  The trial court concluded, as a matter of law, that Domino's was not vicariously liable on any claim alleged in the complaint.  Patterson's action against Domino's was dismissed.

On appeal, the court applied the same basic principles as did the trial court, but reached the opposite result.  According to the Court of Appeal, reasonable inferences could be drawn from the franchise contract and the MRG that Sui Juris lacked managerial independence.  The court listed many of the standards and procedures imposed by Domino's, and noted that they concerned far more than food preparation.  The Court of Appeal also found evidence that Domino's meddled in Sui Juris's employment decisions.  On this score, the court emphasized Poff's testimony about following Lee's instructions, particularly her reference to firing Miranda.  Hence, faced with Domino's contrary evidence (which it never

---

[11]    We note that Domino's replied to Patterson's opposition to summary judgment.  Domino's repeated its prior arguments that the "employer" and "agency" elements of Patterson's claims were missing as a matter of law.  Domino's also objected to Patterson's evidence in certain respects.  Most of these objections were overruled.  None is relevant here.

described), the Court of Appeal found a triable issue of fact on Domino's role as an "employer" or "principal" for vicarious liability purposes. The judgment that had been entered in Domino's favor was reversed.

We granted Domino's petition for review. The issue was limited to determining a franchisor's potential vicarious liability for wrongful acts committed by one employee of a franchisee while supervising another employee of the franchisee.

## II. DISCUSSION[12]

### A. Special Features of the Franchise Relationship

Companies can market goods and services in more than one way. In an integrated method of distribution, the company uses its own employees and other assets to operate chain or branch stores. In doing so, it reaps the full benefits (e.g., maximizing profits) and bears the full burdens (e.g., investing capital and risking liability) of running a business. (Killion, *Franchisor Vicarious Liability — The Proverbial Assault on the Citadel* (2005) 24 Franchise L.J. 162, 165 (*Citadel*); see Shelley & Morton, "*Control*" *in Franchising and the Common Law* (2000) 19 Franchise L.J. 119, 121 (*Control*) [noting huge cost of company-owned stores].)

Franchising is different. (See *Beck v. Arthur Murray, Inc.* (1966) 245 Cal.App.2d 976, 981.) It is a distribution method that has existed in this country in one form or another for over 150 years. (Obermeyer, *Resolving the Catch 22*: *Franchisor Vicarious Liability for Employee Sexual Harassment Claims Against*

---

[12] Joint amicus curiae briefs have been filed on behalf of Domino's by (1) the International Franchise Association and the California Restaurant Association, (2) the Employers Group, the California Employment Law Council, and the California Chamber of Commerce, (3) the Automobile Club of Southern California, and (4) "Eleven Health Club Franchisees." An amicus curiae brief has been filed on Patterson's behalf by the Consumer Attorneys of California.

*Franchisees* (2007) 40 Ind. L.Rev. 611, 614-615 (*Catch 22*) [describing "product distribution" franchises that began in the mid-1800's when farm and sewing machine manufacturers sold goods to dealers who resold them to the public].)

However, it was not until the 1950's that a form of franchising called the "business format" model began to emerge. (*Catch 22, supra*, 40 Ind. L.Rev. 611, 615-616.) This model (which we describe below) is used heavily, but not exclusively, in the fast food industry. The rise of business format franchising has been attributed to the post-World War II growth in population, personal income, retail spending, and automobile use. (Killion, *The Modern Myth of the Vulnerable Franchisee*: *The Case for a More Balanced View of the Franchisor-Franchisee Relationship* (2008) 28 Franchise L.J. 23, 24 (*Modern Myth*).)

Today, the economic effects of franchising are profound. Annually, this sector of the economy, including the fast food industry, employs millions of people, carries payrolls in the billions of dollars, and generates trillions of dollars in total sales.[13]

Under the business format model, the franchisee pays royalties and fees for the right to sell products or services under the franchisor's name and trademark.

---

[13] In 2010, the United States Census Bureau released its first-ever comprehensive report for franchised business. The report is based on the 2007 Economic Census — a survey that is conducted every five years. Franchises accounted for 10.5 percent of businesses with paid employees in the 295 industries in which data was collected. Franchised businesses also accounted for almost $1.3 trillion out of the $7.7 trillion in total sales for these industries, $153.7 billion out of the $1.6 trillion in total payroll, and 7.9 million workers out of a total workforce of 59 million. (U.S. Census Bureau, "Census Bureau's First Release of Comprehensive Franchise Data" (Sept. 14, 2010) <https://www.census.gov/ newsroom/releases/archives/economic_census/cb10-141.html> [news release] [as of August 28, 2014]; U.S. Census Bureau, "2007 Economic Census Franchise Statistics" <http://www.census.gov/econ/census/pdf/franchise_flyer.pdf > [selected graphs] [as of August 28, 2014].)

In the process, the franchisee *also* acquires a business plan, which the franchisor has crafted for all of its stores. (*Catch 22*, *supra*, 40 Ind. L.Rev. 611, 615-616.) This business plan requires the franchisee to follow a system of standards and procedures. A long list of marketing, production, operational, and administrative areas is typically involved. (See *Control*, *supra*, 19 Franchise L.J. 119, 121.) The franchisor's system can take the form of printed manuals, training programs, advertising services, and managerial support, among other things. (*Catch 22*, *supra*, 40 Ind. L.Rev. 611, 616.)[14]

The business format arrangement allows the franchisor to raise capital and grow its business, while shifting the burden of running local stores to the franchisee. (*Citadel, supra*, 24 Franchise L.J. 162, 165.) The systemwide standards and controls provide a means of protecting the trademarked brand at great distances. (King, *Limiting the Vicarious Liability of Franchisors for the Torts of their Franchisees* (2005) 62 Wash. & Lee L.Rev. 417, 423 (*Vicarious Liability*).) The goal — which benefits both parties to the contract — is to build and keep customer trust by ensuring consistency and uniformity in the quality of goods and services, the dress of franchise employees, and the design of the stores themselves. (Blair & Lafontaine, *Understanding the Economics of Franchising*

---

[14] (See Corp. Code, § 31005, subd. (a) [defining a " '[f]ranchise' " under the Franchise Investment Law, which regulates the offer and sale of franchises, as a contractual right granted to a franchisee, in exchange for a franchise fee, to engage in a business which offers, sells, or distributes goods or services, and which is operated under a marketing plan or system prescribed in substantial part by a franchisor and substantially associated with the franchisor's trademark]; see also Bus. & Prof. Code, § 20001, subd. (a) [setting forth a similar definition of " 'franchise' " in the California Franchise Relations Act, which regulates the renewal, transfer, and termination of franchises]; see, generally, *Gentis v. Safeguard Business Systems, Inc*. (1998) 60 Cal.App.4th 1294, 1297-1301.)

*and the Laws That Regulate It* (2006) 26 Franchise L.J. 55, 59-60; *Control*, *supra*, 19 Franchise L.J. 119, 121.)**15**

The franchisee is often an entrepreneurial individual who is willing to invest his time and money, and to assume the risk of loss, in order to own and profit from his own business. (*Modern Myth, supra*, 28 Franchise L.J. 23, 28.) In the typical arrangement, the franchisee decides who will work as his employees, and controls day-to-day operations in his store. (*Inadvertent Employer, supra,* 27 Franchise L.J. 224.) The franchise arrangement puts the franchisee in a better position than other small businesses. (*Catch 22*, *supra*, 40 Ind. L.Rev. 611, 617.) It gives him access to resources he otherwise would not have, including the uniform operating system itself. (*Control*, *supra*, 19 Franchise L.J. 119, 121.)**16**

### B. Analysis of the Arguments and the Law

Patterson's allegations against Domino's under FEHA center on the provision making it unlawful "[f]or an *employer*, . . . because of . . . sex, . . . to

---

**15**      Federal trademark law plays some role in this process. (See Fournaris, *The Inadvertent Employer: Legal and Business Risks of Employment Determinations to Franchise Systems* (2008) 27 Franchise L.J. 224 (*Inadvertent Employer*) [stating that federal law "obligates a licensor of trademarks, such as a franchisor, to protect the integrity of its registered and unregistered marks by monitoring their use, as well as the quality of the goods and services bearing such marks"]; *Vicarious Liability, supra*, 62 Wash. & Lee L.Rev. 417, 468 [noting trademark may be deemed "abandoned" under federal law if licensor fails to exercise sufficient control over its use by licensee]; see also, 15 U.S.C. § 1127 [defining when trademark is deemed "abandoned"]; 1 Browne, Cal. Business Litigation (Cont.Ed.Bar 2014) Trademarks, § 6.128, pp. 6-87 to 6-90 [discussing defense of "abandonment" in trademark infringement suits].)

**16**      Domino's franchisees are known to be particularly well motivated. (See *Catch 22, supra*, 40 Ind. L.Rev. 611, 616, fn. 45.) According to Devereaux, the company has an "internal" selection system. Most of its franchisees have been the manager of a Domino's pizza store for at least one year, and have completed training as both a manager and a franchisee.

harass an employee." (§ 12940, subd. (j)(1), italics added; see *id*., subds. (h) [an "employer" cannot retaliate against any person who has complained about unlawful sexual harassment], and (k) [an "employer" must take all reasonable steps necessary to prevent unlawful sexual harassment]; see also *id*. subd. (j)(1)(4)(A) [an "employer" includes "any person regularly employing one or more persons"].) Also, "under the FEHA, an *employer* is strictly liable for all acts of sexual harassment by a supervisor." (*State Dept. of Health Services v. Superior Court* (2003) 31 Cal.4th 1026, 1042 (*State Dept.*), italics added and omitted; see *id*. at p. 1041, fn. 3 [harassment must occur while supervisor was acting in such capacity and cannot be unconnected with employment].) Broadly speaking, FEHA seeks to prevent workplace sexual harassment through the employer's adoption, use, and enforcement of sexual harassment policies. (*State Dept., supra,* at pp. 1034 [employers are "the first line of defense against sexual harassment in the workplace"], 1044 [an employer is not liable for sexual harassment damages the employee reasonably could have avoided by using policies already in place].)

Likewise, the venerable respondeat superior rule provides that "an *employer* may be held vicariously liable for torts committed by an employee within the scope of employment." (*Mary M. v. City of Los Angeles* (1991) 54 Cal.3d 202, 208, italics added.) The doctrine contravenes the general rule of tort liability based on fault. (*Ibid*.) Under certain circumstances, the employer may be subject to this form of vicarious liability even for an employee's willful, malicious, and criminal conduct. (*Lisa M. v. Henry Mayo Newhall Memorial Hospital* (1995) 12 Cal.4th 291, 296-299.) Three policy justifications for the respondeat superior doctrine have been cited — prevention, compensation, and risk allocation. They do not always apply. (See *id*. at pp. 304-305 [concluding that such aims would not necessarily be served by holding hospital vicariously liable for sexual assault by a technician against a patient during ultrasound test];

21

cf. *Farmers Ins. Group v. County of Santa Clara* (1995) 11 Cal.4th 992, 1003-1019 [public entity need not indemnify employee under Government Claims Act in § 825 et seq. because his liability under FEHA for sexual harassment of coworkers was outside scope of employment].)

We know of no decision by a California court addressing a franchisor's statutory or common law liability under FEHA for sexual harassment claims made by one employee of a franchisee against another employee (or supervisor) of the franchisee. Nor has this court decided whether a franchisor may be considered an "employer" who is vicariously liable for torts committed by someone working for the franchisee.

Against this backdrop, the parties debate here, as they did in the courts below, the significance of certain Court of Appeal cases that have considered whether a franchisee was the "agent" of the franchisor for purposes of compensating a nonemployee for actionable harm caused by the franchisee. According to Patterson, the agency principles set forth in these decisions support her claim that, because business-format franchisors wield detailed control over their franchisees' general operations, liability for personal harm sustained in the course of a franchisee's business should be borne by the franchisor. On the other hand, Domino's suggests that too literal an application of the traditional "agency" approach ignores the realities of modern franchising, which impose a meaningful division of autonomous authority between franchisor and franchisee. Domino's claims the critical factor is whether the franchisor had day-to-day control over the specific "instrumentality" that caused the alleged harm — here, sexual harassment of one employee of the franchisee by another. We now review the relevant law.

One early California decision addressing the allocation of legal liability between franchisor and franchisee is *Nichols v. Arthur Murray, Inc*. (1967) 248 Cal.App.2d 610 (*Nichols*). In *Nichols*, the plaintiff was a customer who had

22

signed contracts with the franchisee, a dance studio, and had paid in advance for lessons she never received. The Court of Appeal found sufficient evidence to support the trial court's ruling that the franchisor was responsible for the contractual obligations incurred by its franchisee. Relying heavily on much older decisions of this court, none of which concerned franchising, the *Nichols* court observed that "[a]n undisclosed principal is liable for the contractual obligations incurred by his agent in the course of the agency." (*Id.* at p. 612, citing *Shamlian v. Wells* (1925) 197 Cal. 716, 721; *Geary St. etc. R. R. Co. v. Rolph* (1922) 189 Cal. 59, 64; see *Hulsman v. Ireland* (1928) 205 Cal. 345, 352.)

The Court of Appeal in *Nichols* identified the "right to control" as a significant factor in defining an agency relationship. (*Nichols*, *supra*, 248 Cal.App.2d 610, 613.) No express definition of "control" was given. However, the *Nichols* court cited various cases of this court (*ibid.*) for the basic proposition that an agency relationship exists where the principal dictates, not just the desired result of the enterprise, but also "the manner and means" by which such result is achieved. (*City of Los Angeles v. Vaughn* (1961) 55 Cal.2d 198, 201; see *Malloy v. Fong* (1951) 37 Cal.2d 356, 370; *Burlingham v. Gray* (1943) 22 Cal.2d 87, 94, 99-100; *Robinson v. George* (1940) 16 Cal.2d 238, 243-244.)

Analyzing the record before it, the Court of Appeal in *Nichols* rejected the franchisor's claim that the parties' contract was narrowly tailored to protect the trade name under which the business operated. (See *Nichols*, *supra*, 248 Cal.App.2d 610, 613.) Nor were the controls retained by the franchisor necessarily limited to protecting its trade name, professional methods, customer goodwill, or commercial image. (*Id.* at p. 615.) Rather, much like the trial court there, the appellate court in *Nichols* concluded that the franchisor retained complete control over most areas of the business, and deprived the franchisee of

23

any independence in managing the " 'day to day details of [its] operation.' " (*Id.* at p. 614; see *id*. at pp. 615-617.)

In particular, the franchisor retained the right to control the employment of all persons working in any capacity for the franchisee; to decide matters related to studio location, decoration, and advertisement; to set minimum tuition rates and select the institution handling student financing; to make student refunds and charge those amounts to the franchisee; to settle and pay all claims against the franchisor arising out of the operation of the business; to reimburse itself for the payment of any refunds, claims, or related litigation costs from a fund consisting of weekly payments by the franchisee; to invest the proceeds from this fund and pay the franchisee only such portion of the income as the franchisor saw fit; to dictate the manner in which unused dancing lessons would be honored among franchisees; and to require the franchisee to provide records on accounting, insurance, and tax matters. The contract also contained a broad provision requiring the franchisee to run the studio according to " 'the general policies of the [franchisor] as established from time to time,' " and permitting immediate cancellation for failure to maintain such policies. (*Nichols, supra*, 248 Cal.App.2d 610, 615.) Such pervasive controls made the franchisor the party responsible for the franchisee's contractual obligations towards the plaintiff. (*Id*. at p. 617.)[17]

---

[17]    (Accord, *Holland v. Nelson* (1970) 5 Cal.App.3d 308, 313 [upholding trial court finding that agency relationship existed between franchisor, Arthur Murray, Inc., and its franchisee, under circumstances similar to those present in *Nichols, supra*, 248 Cal.App.2d 610]; *Porter v. Arthur Murray, Inc*. (1967) 249 Cal.App.2d 410, 420-421 [similar conclusion against same franchisor]; see *People v. JTH Tax, Inc*. (2013) 212 Cal.App.4th 1219, 1243-1247 [finding sufficient evidence to support trial court judgment that franchisor, a tax and loan service company, was vicariously liable for its franchisees' illegal advertising]; *Kuchta v. Allied Builders Corp*. (1971) 21 Cal.App.3d 541, 546-547 [finding sufficient evidence to support

*(footnote continued on next page)*

Other Court of Appeal decisions, however, have since declined to impute to franchisors the harm inflicted on the public by their franchisees. These courts reasoned that the franchisors there at issue lacked sufficient control of their franchisees' day-to-day operations, including employment matters. (See *Kaplan v. Coldwell Banker Residential Affiliates, Inc*. (1997) 59 Cal.App.4th 741, 745-746 [upholding summary judgment for real estate brokerage company insofar as it was not liable on a "true agency" theory for fraud a real estate broker committed against his client where the broker owned and operated the franchise, hired and fired employees, and set wages and office hours, among other things];[18] *Weiss v. Chevron, U.S.A., Inc*. (1988) 204 Cal.App.3d 1094, 1100 [upholding summary judgment for oil company on ground it was not liable on agency theory for a vehicle crash caused by a service station employee, where station operated as an independent business whose employees were not hired, supervised, or fired by oil company]; *Wickham v. Southland Corp*. (1985) 168 Cal.App.3d 49, 54 [finding sufficient evidence to support jury verdict that franchisor was not liable on agency grounds for franchisee's sale of liquor to intoxicated minor who caused fatal crash

---

*(footnote continued from previous page)*

jury verdict that franchisor, a building company, was vicariously liable to plaintiff homeowners for fraud and breach of contract by its franchisee, a contractor].)

[18]     Elsewhere in its discussion, the Court of Appeal in *Kaplan v. Coldwell Banker Residential Affiliates, Inc*., *supra*, 59 Cal.App.4th 741, concluded that a triable issue of fact existed on the entirely distinct question whether the franchisee was an "ostensible agent" of the franchisor. (*Id*. at p. 748.) " 'Liability of the principal for the acts of an ostensible agent rests on the doctrine of "estoppel," the essential elements of which are representations made by the principal, justifiable reliance by a third party, and a change of position from such reliance resulting in injury.' " (*Id*. at p. 747) There is no issue of ostensible agency in the present case.

where franchisee hired and fired employees, set and paid their wages, and directed their work, among other things].)

One of the more recent cases analyzing franchising in agency terms is *Cislaw v. Southland Corp.* (1992) 4 Cal.App.4th 1284 (*Cislaw*). There, the parents of a teenage boy filed a wrongful death action against Southland Corporation (Southland), which owned the 7-Eleven trademark and was the franchisor of 7-Eleven stores in California. The plaintiffs claimed their son died after using clove cigarettes sold at a 7-Eleven franchise owned by the Trujillos. The complaint stated tort and breach of warranty claims. Southland sought summary judgment asserting, inter alia, that it had no vicarious liability for the Trujillos' conduct because, as franchisees, they were independent contractors who had no agency or other relationship with Southland over which it had control. Based on the franchise contract, and the declarations of Mrs. Trujillo and a Southland employee, the trial court granted summary judgment for Southland. (*Id*. at p. 1287.)

On appeal, the court in *Cislaw* relied on the few available California decisions to define the effect of franchise relationships on third parties. The court stated the law as follows: "The general rule is where a franchise agreement gives the franchisor the right of complete or substantial control over the franchisee, an agency relationship exists. [Citation.] '[I]t is the right to control the *means and manner* in which the result is achieved that is significant in determining whether a principal-agency relationship exists.' " (*Cislaw*, *supra*, 4 Cal.App.4th 1284, 1288.) The court observed, however, that "the franchisor's interest in the reputation of its entire system allows it to exercise certain controls over the enterprise without running the risk of transforming its independent contractor franchisee into an agent." (*Id*. at p. 1292.) Such interests were identified as the protection of "trademark, trade name, and goodwill." (*Id*. at pp. 1295, 1296.)

26

The court in *Cislaw* determined that the evidence showed no agency relationship in which the franchisor had the requisite control over the franchisee. At the outset, the court observed that the Trujillos bought the right to use the 7-Eleven name in exchange for a percentage of net sales. The Trujillos were contractually required to undergo training; keep the store clean; maintain the equipment; carry an inventory of a " 'type, quality, quantity and variety' " that reflected the 7-Eleven image; operate the store at certain times; make daily deposits into a designated account; provide purchase and sales records; and make the books available for inspection. (*Cislaw*, *supra*, 4 Cal.App.4th 1284, 1294.)

Nevertheless, the *Cislaw* court concluded that Southland did not possess the "all-important right to control the means and manner" in which the store operated on a day-to-day basis. (*Cislaw*, *supra*, 4 Cal.App.4th 1284, 1295.) First, the Trujillos made all inventory decisions. The contract stated that they were not required to use certain vendors, to purchase merchandise recommended by 7-Eleven, or to sell merchandise at prices suggested by 7-Eleven. Consistent with these terms, the evidence showed that the Trujillos alone decided to sell the clove cigarettes that allegedly killed the plaintiffs' son. Southland did not recommend the sale of this product to the Trujillos or advertise it to the public. Nor could Southland block the sale of clove cigarettes at the Trujillos' store. (*Id.* at pp. 1293-1294.)

Second, under the terms of the contract, the Trujillos made all employment decisions in their store. In other words, they had the sole right to employ and discharge staff as they saw fit. Such persons were deemed to be the employees of the Trujillos, not of Southland. In a related vein, the contract gave the Trujillos full responsibility for the conduct of their employees, including the power to supervise, discipline, and compensate them, and to arrange their work schedules.

27

(*Cislaw, supra*, 4 Cal.App.4th 1284, 1294.) In fact, the Trujillos handled personnel matters with no input or oversight by Southland. (*Id*. at p. 1293.)

Third, and in more general terms, the contract in *Cislaw* described the Trujillos as "independent contractors" who controlled " 'the manner and means' " by which the store operated. (*Cislaw*, *supra*, 4 Cal.App.4th 1284, 1294.) The Trujillos paid all operating expenses. (*Id*. at p. 1293.) Absent a material breach of contract, Southland could not terminate the contract — evidence the *Cislaw* court deemed significant in determining that an independent contractor relationship was in fact created by the parties. (*Id*. at p. 1296.) In sum, the court found, as a matter of law, that no agency relationship existed between the franchisor and franchisee. Accordingly, it held that summary judgment had properly been entered against the plaintiffs on vicarious liability grounds. (*Id*. at p. 1297.)

Patterson contends, based on the foregoing principles and authorities, that operating systems like the one used by Domino's protect far more than trademark, trade name, and goodwill, and deprive franchisees of the means and manner by which to assert managerial control. Like the instant Court of Appeal, she reasons that the degree of control exercised by franchisors like Domino's makes each franchisee the agent of the franchisor for all business purposes, and renders each employee of the franchisee an employee of the franchisor in vicarious liability terms.[19] We disagree.

---

**19** We note that the Court of Appeal opinion in this case reached a result at odds with the apparent majority of decisions in other states which have framed the issue in analogous terms. These sister-state courts have declined on summary judgment to find an agency or employment relationship that would support a vicarious liability claim against a franchisor. A few of them involve sexual misconduct in the workplace. (See, e.g., *Kennedy v. Western Sizzlin Corp*. (Ala. 2003) 857 So.2d 71, 77 [franchisee sexually harassed employees in his restaurant]; *D.L.S. v. Maybin* (Wash.Ct.App. 2005) 121 P.3d 1210, 1212-1213 [assistant

*(footnote continued on next page)*

At the outset, we observe, as Domino's suggests, that no prior California decision has faced a modern business-format system operating on a grand scale while allocating control along a fine contractual line. In *Nichols, supra*, 248 Cal.App.2d 610, for instance, the franchise contract left virtually *nothing* in the franchisee's hands. Conversely, the franchisee possessed almost *all* operational control in *Cislaw, supra*, 4 Cal.App.4th 1284. We conclude as follows:

The "means and manner" test generally used by the Courts of Appeal cannot stand for the proposition that a comprehensive operating system alone constitutes the "control" needed to support vicarious liability claims like those raised here. As noted, a franchise contract consists of standards, procedures, and requirements that regulate each store for the benefit of both parties. This approach

---

*(footnote continued from previous page)*

manager of McDonald's engaged in sexual relationship with teenage coworker]; *J.M.L. ex rel. T.G. v. A.M.P.* (N.J.Super.Ct.App.Div. 2005) 877 A.2d 291, 296-297 [franchisee engaged in sexual relationship with underage girl who worked in his karate studio].) Different wrongful acts by franchisee employees appear in other pro-franchisor decisions resolved before trial in other states. (See, e.g., *Rainey v. Langen* (Me. 2010) 998 A.2d 342, 346-351 [vehicle collision]; *McLaughlin v. Chicken Delight, Inc.* (Conn. 1973) 321 A.2d 456, 459-460 [vehicle collision]; *Foster v. Steed* (Utah 1967) 432 P.2d 60, 62-63 [service station accident]; *Parmenter v. J & B Enterprises, Inc.* (Miss.Ct.App. 2012) 99 So.3d 207, 213-215 [assault]; *Ellison v. Burger King Corp.* (Ga.Ct.App. 2008) 670 S.E.2d 469, 475 [battery]; *Martinez v. Higher Powered Pizza, Inc.* (N.Y.App.Div. 2007) 43 A.D.3d 670, 671-672 [vehicle collision]; *Gabler v. Holder and Smith, Inc.* (Okla.Civ.App. 2000) 11 P.3d 1269, 1274 [breach of contract]; *Smith v. Foodmaker, Inc.* (Tex.App. 1996) 928 S.W.2d 683, 688 [murder]; *Little v. Howard Johnson Co.* (Mich.Ct.App. 1990) 455 N.W.2d 390, 393-394 [slip and fall].) It appears fewer out-of-state decisions have reached a contrary result. (See, e.g., *Miller v. McDonald's Corp.* (Or.Ct.App. 1997) 945 P.2d 1107; *Balderas v. Howe* (Mo.Ct.App. 1995) 891 S.W.2d 871; *Parker v. Domino's Pizza, Inc.* (Fla.Dist.Ct.App. 1993) 629 So.2d 1026.)

minimizes chain-wide variations that can affect product quality, customer service, trade name, business methods, public reputation, and commercial image.[20]

More to the point, there are sound and legitimate reasons for business format contracts like the present one to allocate local personnel issues almost exclusively to the franchisee. As we have explained, franchisees are owner-operators who hold a personal and financial stake in the business. A major incentive is the franchisee's right to hire the people who work for him, and to oversee their performance each day. A franchisor enters this arena, and becomes potentially liable for actions of the franchisee's employees, only if it has retained or assumed a general right of control over factors such as hiring, direction, supervision, discipline, discharge, and relevant day-to-day aspects of the

---

[20]     (See generally *Citadel, supra*, 24 Franchise L.J. 162, 164 [noting that the problem with applying the traditional agency model to determine vicarious liability in the franchising context is that franchising is "all about controls"]; *Control*, *supra*, 19 Franchise L.J. 119, 120 [calling for a clear distinction between "two fundamentally different concepts of control" — the control implicit in the franchise relationship, which should not necessarily warrant vicarious liability, and day-to-day operational control, which might warrant vicarious liability]; Flynn, *The Law of Franchisor Vicarious Liability*: *A Critique* (1993) 1993 Colum. Bus. L.Rev. 89, 91 [observing that the traditional agency model does not work well in determining the vicarious liability of a franchisor because there must be some franchisor control "over the means of performance"]; Laufer & Gurnick, *Minimizing Vicarious Liability of Franchisors for Acts of Their Franchisees* (1987) 6 Franchise L.J. No. 4, 3 (*Minimizing*) [maintaining that the "control required for a franchise to exist is not inherently sufficient to establish an actual agency"].)

workplace behavior of the franchisee's employees.[21]  Any other guiding principle would disrupt the franchise relationship.[22]

Courts in other states have endeavored to apply their own standards under analogous circumstances.  As in the present case, these courts were faced with applying traditional vicarious liability principles involving the extent of the franchisor's control over the franchisee's day-to-day operations.  Reaching pretrial results favoring the franchisors, these out-of-state courts declined to rely on the uniform operating standards inherent in franchising to establish an agency or employment relationship between the franchisor and the franchisee and its

---

[21]    Thus, the mere fact that the franchisor has reserved the right to require or suggest uniform workplace standards intended to protect its brand, and the quality of customer service, at its franchised locations is not, standing alone, sufficient to impose "employer" or "principal" liability on the franchisor for statutory or common law violations by one of the franchisee's employees toward another. Here, for example, Domino's right to enforce rules relating to franchise territories and brand integrity was the clear basis for any suggestions area leader Lee made to franchise owner Poff concerning the treatment of Poff's employee Dave Knight. (See, *ante*, fn. 9.)  As noted above, in blatant violation of these rules, Knight was delivering non-Domino's food in marked Domino's bags to a location outside Poff's designated delivery area.  Contrary to implications in the dissenting opinion, the Knight incident does not indicate Lee had asserted the right to control relevant aspects of the day-to-day workplace behavior of Poff's employees.

[22]    (See generally *Inadvertent Employer, supra*, 27 Franchise L.J. 224 [observing that franchisees "control the day-to-day operations of their franchised businesses," including the right to "hire and fire their own employees"]; Ellis & Alcantar, *Franchisor Liability for the Criminal Acts of Others* (1998) 18 Franchise L.J. 11, 12 [asserting that a franchisor should not be held liable for injurious acts of a franchisee's employees "if it does not control personnel decisions," including hiring and firing]; *Vicarious Liability, supra*, 62 Wash. & Lee L.Rev. 417, 467 [noting that the franchise relationship " 'sets out a detailed scheme of control between two autonomous businesses' "]; *Minimizing, supra*, 6 Franchise L.J. 3, 6 [suggesting that franchise contracts "normally" give the franchisee control over the hiring and firing of employees].)

employees.  Their terminology varies, but these courts have focused on the franchisor's lack of control over the "instrumentality" (*Papa John's Intern., Inc. v. McCoy* (Ky. 2008) 244 S.W.3d 44, 54), the "conduct" (*Depianti v. Jan-Pro Franchising Int'l, Inc.* (Mass. 2013) 990 N.E.2d 1054, 1063; *Viado v. Domino's Pizza, LLC* (Or.Ct.App. 2009) 217 P.3d 199, 210), or the " 'specific aspect of the franchisee's business' " (*Ketterling v. Burger King Corp.* (Idaho 2012) 272 P.3d 527, 533; *Kerl v. Rasmussen, Inc.* (Wis. 2004) 682 N.W.2d 328, 341) that caused the alleged injury.

Patterson contends that rejection of her views would immunize franchisors from vicarious liability for enterprise-related harm.  Such an outcome, she maintains, contravenes the public interest in protecting employees from sexual harassment, and in securing compensation from companies that can absorb the loss.  However, as Domino's suggests, these policy arguments lose force when the party from whom compensation is sought did not directly control the workforce, and could not have prevented the misconduct and corrected its effects.  (See *State Dept., supra*, 31 Cal.4th 1026, 1044.)  As noted above, we cannot conclude that franchise operating systems *necessarily* establish the kind of employment relationship that concerns us here.  A contrary approach would turn business format franchising "on its head."  (*Control*, *supra*, 19 Franchise L.J. 119, 120.)

Finally, nothing we say here is materially at odds with the analysis that would apply if we examined plaintiff's three FEHA claims in terms of the principles developed under this statutory scheme *outside* of the franchising context.  In general, FEHA is designed to prevent and deter unlawful employment practices, and to redress their adverse effects.  (§ 12920.5; *State Dept., supra*, 31 Cal.4th 1026, 1044.)  Essential to plaintiff's statutory claims is the existence of "an employment relationship."  (*Vernon, supra*, 116 Cal.App.4th 114, 127.)  In other words, and as noted above, Domino's statutory liability for the acts of sexual

harassment that allegedly occurred at the Sui Juris store depends on whether Domino's was an "employer" of both plaintiff and the harasser, Miranda. (§ 12940, subds. (h) [retaliation for reporting sexual harassment], (j)(1) [sexual harassment], (k) [failure to take preventative steps].)

There are few California cases defining an "employer" under the FEHA provisions invoked here. But, it appears, traditional common law principles of agency and respondeat superior supply the proper analytical framework under FEHA, as they do for franchising generally. Courts in FEHA cases have emphasized "the control exercised by the employer over the employee's performance of employment duties." (*Bradley v. Department of Corrections & Rehabilitation* (2008) 158 Cal.App.4th 1612, 1626, citing *Vernon, supra*, 116 Cal.App.4th 114, 124-125; accord, *McCoy v. Pacific Maritime Assn.* (2013) 216 Cal.App.4th 283, 301-302.) This standard requires "a comprehensive and immediate level of 'day-to-day' authority" over matters such as hiring, firing, direction, supervision, and discipline of the employee. (*Vernon, supra*, 116 Cal.App.4th at pp. 127-128.)

As discussed above, Domino's lacked the general control of an "employer" or "principal" over relevant day-to-day aspects of the employment and workplace behavior of Sui Juris's employees. Application of the FEHA test for determining an employment relationship produces no different result in this franchising case than the one we have already reached. Plaintiff is mistaken to the extent she implies that the contrary is true.

### C. Application of the Law to the Present Case

In reviewing a grant of summary judgment, we independently evaluate the record, liberally construing the evidence supporting the party opposing the motion, and resolving any doubts in his or her favor. (*Lyle v. Warner Brothers Television Productions* (2006) 38 Cal.4th 264, 274.) As the moving party, the defendant

must show that the plaintiff has not established, and reasonably cannot be expected to establish, one or more elements of the cause of action in question. (*Hernandez v. Hillsides, Inc*. (2009) 47 Cal.4th 272, 285.)  Here, the Court of Appeal erred in finding a triable issue of fact on whether an employment or agency relationship existed as a prerequisite to holding Domino's strictly or vicariously liable for Miranda's alleged sexual harassment of Patterson.[23]

We start with the contract itself.  Under its literal terms, Sui Juris paid for the right to sell Domino's products using the company's business format system, including the contract and the MRG.  The contract said there was no principal-agent relationship between Domino's and Sui Juris.  The latter also had no authority to act on the former's behalf.  Notwithstanding any training, support, or oversight on Domino's part, Sui Juris agreed to act as an "independent contractor."

Likewise, the contract stated that persons who worked in the Sui Juris store were the employees of Sui Juris, and that no employment or agency relationship existed between them and Domino's.  Domino's disclaimed any rights or responsibilities as to Sui Juris's employees.  Hence, nothing in the contract granted Domino's any of the functions commonly performed by employers.  All such

---

**23**      At least two courts in other states have recently upheld summary judgment for Domino's, as a franchisor, because it did not possess sufficient supervisorial control to be held vicariously liable on an agency or employment theory for torts committed by employees of a Domino's franchisee.  Such was the case despite evidence of standard Domino's contracts and reference guides closely related to those at issue here.  (See *Rainey v. Langen, supra*, 998 A.2d 342, 350-351; *Viado v. Domino's Pizza, LLC, supra,* 217 P.3d 199, 209.)  Patterson, like the Court of Appeal opinion in the instant case, quotes language from an older decision that reached the opposite result.  (*Parker v. Domino's Pizza, Inc*., *supra*, 629 So.2d 1026, 1029 [describing Domino's reference guide as "a veritable bible for overseeing a Domino's operation"].)

rights and duties were allocated to Sui Juris. They included, but were not expressly limited to, "recruiting, hiring, training, scheduling for work, supervising and paying" persons employed by Sui Juris.

The contract also stated that Domino's had no duty to operate the Sui Juris store. Nor did Domino's have the right to direct Sui Juris's employees in store operations. Rather, the contract made Sui Juris solely responsible for managing its employees with respect to the proper performance of their tasks. Poff agreed to provide close, full-time supervision in this regard. Domino's disclaimed liability under the contract for any damages arising out of the operation of the store.

Consistent with the exclusive control vested in Sui Juris over its own employees, neither the contract nor the MRG empowered Domino's to establish a sexual harassment policy or training program for Sui Juris's employees. Nor was there any procedure by which Sui Juris's employees could report such complaints to Domino's. In fact, the topic did not appear in the franchise documents at all.

Thus, under the foregoing terms, Domino's had no right or duty to control employment or personnel matters for Sui Juris. In other words, Domino's lacked contractual authority to manage the behavior of Sui Juris's employees while performing their jobs, including any acts that might involve sexual harassment.

Of course, the parties' characterization of their relationship in the franchise contract is not dispositive. (*Nichols, supra*, 248 Cal.App.2d 610, 613.) We must also consider those evidentiary facts set forth in the summary judgment materials as to which objections were not made and sustained. (See *Hernandez v. Hillsides, Inc., supra*, 47 Cal.4th 272, 285; *Cislaw, supra*, 4 Cal.App.4th 1284, 1292.)

According to the testimonial evidence, Poff exercised sole control over selecting the individuals who worked in his store. He did not include Domino's in the application, interview, or hiring process. Nor did anyone attempt to intervene

35

on Domino's behalf.  It was Poff's decision to hire Patterson as a new employee and to otherwise retain the existing staff when he bought the franchise.

Evidence about the training of Sui Juris's employees is more nuanced, but did not indicate control over relevant day-to-day aspects of employment and employee conduct.  It appears the parties did not follow the literal language of the contract placing sole responsibility on Sui Juris for handling *all* training programs for its employees.  Domino's provided new employees with orientation materials in both electronic and handbook form.  Such programs supplemented the training that Poff was required to conduct.  Lee, Poff's area leader, did not help him train anybody.

However, *with respect to training employees on how to treat each other at work*, *and how to avoid sexual harassment*, it appears that Sui Juris, not Domino's, was in control.  There was no evidence that the training programs Domino's placed on the PULSE computer system covered these subjects.  As best Poff could recall, only pizza-making, store operations, safety and security, and driving instructions were involved.  Also, nothing indicates the extent, if any, to which Poff borrowed from *his* mandatory Domino's training as a franchisee to craft a sexual harassment policy for his store.  Poff could not recall what, if anything, he learned from Domino's on this score.

What is clear is that Poff implemented his *own* sexual harassment policy and training program for his employees.  He adopted a zero tolerance approach, among other things.  Poff held meetings in which he personally and vigorously trained his managers about sexual harassment.  He also installed his policy on the PULSE computer system for other employees to view.

No Domino's representative, including Lee, trained Sui Juris employees on sexual harassment.  Nothing in the record indicates that any Domino's

representative reviewed Poff's sexual harassment policy, discussed its substance with Poff or his employees, or observed any training sessions at the store.

Of particular relevance is that Poff's sexual harassment policy and training program came with the authority to impose discipline for any violations. The record shows that Poff, not Domino's, wielded such significant control.

First, Poff encouraged the reporting of sexual harassment complaints directly to him. In training sessions, Poff told his managers to contact him if any issue or question about sexual harassment arose. Poff also told Patterson at the start of her job to advise him of any such problem — a step she soon took. The apparent purpose of Poff's admonitions was to give him the chance to respond by taking appropriate disciplinary action against the offending employee.

Second, Domino's had no procedure for monitoring or reporting sexual harassment complaints between the employees of franchisees. Devereaux, Domino's franchise director, confirmed that the company was not involved in such issues at the local level unless the franchisee himself was implicated or otherwise required training. Consistent with the general "hands-off" approach of area leaders on sexual harassment, there is no evidence that Lee and Poff discussed the topic before Patterson reported Miranda's misconduct to Poff, or before her father contacted Domino's. As noted, Patterson's father used the 1-800 number established for Domino's customers complaining about their meal or service.

Third, Poff acted on Patterson's complaint by taking unilateral disciplinary action. He first suspended Miranda. Poff then started an investigation. However, he could not reach a conclusive result. Miranda subsequently lost his job when he failed to report to work. In doing so, Miranda apparently triggered the "self-termination" clause in Poff's personnel policies. Poff refused to rehire Miranda. There is no evidence that Poff solicited Domino's advice or consent on any of these decisions, or that he was required to do so.

Like the dissenting opinion, Patterson emphasizes evidence that Lee said Poff should "get rid" of Miranda. It is not clear when this statement was made. For several reasons, however, no reasonable inference can be drawn that it was intended or interpreted to mean that Poff had no choice in the matter, that Domino's was in charge, or that consequences would ensue if Poff did not follow Lee's advice.

As noted above, Poff acted with the obvious understanding that the decision whether and how to discipline Miranda was his alone to make. He chose to proceed in a prudent and methodical way by investigating the complaint before a final decision was made. He did not act rashly or as though only one outcome were permissible — i.e., summary termination on sexual harassment grounds.

In addition, Poff acknowledged that Lee's statement was not accompanied by a specific threat, express or implied. She never stated that Poff would risk any sanction if he did not terminate Miranda's employment. Indeed, her statement left Poff with no negative memory about possible repercussions at all. When Lee arrived at the Sui Juris store a short time later, Miranda's disciplinary fate was not discussed. The only concern was whether and how to retrain the Sui Juris staff. By Poff's own account, Lee made helpful training suggestions, not demands.

No reasonable inference can be drawn that Domino's, through Lee, retained or assumed the traditional right of general control an "employer" or "principal" has over factors such as hiring, direction, supervision, discipline, discharge, and relevant day-to-day aspects of the workplace behavior of the franchisee's employees. Hence, there is no basis on which to find a triable issue of fact that an employment or agency relationship existed between Domino's and Sui Juris and its employees in order to support Patterson's claims against Domino's on vicarious liability grounds.

### III. CONCLUSION

Nothing we say herein is intended to minimize the seriousness of sexual harassment in the workplace, particularly by a supervisor. (See *State Dept., supra*, 31 Cal.4th 1026, 1048.) Nor do we mean to imply that franchisors, including those of immense size, can never be held accountable for sexual harassment at a franchised location. A franchisor will be liable if it has retained or assumed the right of general control over the relevant day-to-day operations at its franchised locations that we have described, and cannot escape liability in such a case merely because it failed or declined to establish a policy with regard to that particular conduct. Our holding is limited to determining the circumstances under which an employment or agency relationship exists as a prerequisite to pursuing statutory and tort theories like those alleged against the franchisor here.

The judgment of the Court of Appeal is reversed.


**BAXTER, J.**


**WE CONCUR:**

CANTIL-SAKAUYE, C. J.
CHIN, J.
CORRIGAN, J.

**DISSENTING OPINION BY WERDEGAR, J.**

I write separately to express my disagreement with the majority's application of the law to the facts of this case.

The California Fair Employment and Housing Act (Gov. Code, § 12900 et seq.; hereafter FEHA) makes employers liable for sexual harassment (§ 12940, subd. (j)(1), (4)(A)). Thus, as the majority recognizes, plaintiff Taylor Patterson may recover from defendant Domino's Pizza, LLC (Domino's), on her statutory claim of sexual harassment (Gov. Code, § 12940, subd. (j))[1] if Domino's did something to become a joint employer with its franchisee Daniel Poff (doing business as Sui Juris, LLC), of Poff's employees. Because the FEHA's statutory definition of "employer" is essentially tautological (§ 12940, subd. (j)(4)(A) [" '*employer*' means any person regularly *employing* one or more persons," italics added]), a court properly looks to the common law for guidance, bearing in mind " 'the spirit and letter of the law that it [is] interpreting' " (*Bradley v. Department of Corrections & Rehabilitation* (2008) 158 Cal.App.4th 1612, 1626–1627 (*Bradley*), quoting *Metropolitan Water Dist. v. Superior Court* (2004) 32 Cal.4th 491, 504).[2]

---

[1]     All further statutory references are to the Government Code.

[2]     We have followed the same approach in other contexts in which the relevant statute or regulation has defined the employment relationship tautologically, or not at all. (See, e.g., *Martinez v. Combs* (2010) 49 Cal.4th 35, 64

*(footnote continued on next page)*

The common law offers various definitions of employment. Consequently, courts in FEHA cases have found "no magic formula for determining whether the requisite employment relationship exists. The prevailing view is to consider the totality of the circumstances, reflecting upon the nature of the work relationship between the parties, and placing emphasis on the control exercised by the employer over the employee's performance of employment duties." (*Bradley*, *supra*, 158 Cal.App.4th at p. 1626, citing *Vernon v. State of California* (2004) 116 Cal.App.4th 114, 124–125 (*Vernon*).) The majority, offering its own synthesis of the common law, asks whether the alleged employer "has retained or assumed a general right of control over factors such as hiring, direction, supervision, discipline, discharge, and relevant day-to-day aspects of the workplace behavior of the franchisee's employees." (Maj. opn., *ante*, at p. 3, citing *Vernon*, at p. 124.)

Fidelity to a multi-factored, totality of the circumstances test inevitably means that " '[t]he precise contours of an employment relationship can only be established by a careful factual inquiry.' " (*Vernon*, *supra*, 116 Cal.App.4th at p. 125.) That a franchisor is not automatically the employer of its franchisee's employees, irrespective of the details of the parties' relationship, necessarily follows. So, too, does it follow that a franchisor may under the circumstances of the parties' relationship in fact be an employer. The outcome depends on the factual inquiry. For example, a franchisor, pursuing its legitimate interest in

*(footnote continued from previous page)*

[wage law]; *Metropolitan Water Dist. v. Superior Court*, *supra*, 32 Cal.4th at pp. 500–501 [public retirement law]; *S.G. Borello & Sons, Inc. v. Department of Industrial Relations* (1989) 48 Cal.3d 341, 350 (*Borello*) [workers compensation]; *Tieberg v. Unemployment Ins. App. Bd.* (1970) 2 Cal.3d 943, 949–951 (*Tieberg*) [unemployment insurance].)

ensuring that customers enjoy a similar experience in each franchised location, may implement the franchise agreement in various ways, including ways short of day-to-day oversight, to exercise control over employee selection, training, personal appearance, interaction with customers, and compliance with in-store procedures. This retention of control by the franchisor, enforced by regular inspections and the threat that a noncompliant franchisee will be placed in default, presents occasions for the franchisor to act as an employer by forcing the termination of problematic employees. The majority finds that Domino's successfully walked this tightrope between enforcing contractual standards and becoming an employer by leaving to Poff all decisions about the discharge of his employees, even when cause for discharge existed. Because the case has not been tried, we will never know whether Domino's succeeded or not. Unlike the majority, I would hold that plaintiff has raised a triable issue of fact.

Asked whether Domino's area leader Claudia Lee had "ever t[old] you that you needed to fire any employees," Poff answered "Yes." Those employees were Dave Knight, a manager who had delivered non-Domino's food to schools, and Rene Miranda, plaintiff's alleged harasser. Asked whether Poff rather than Lee had "ultimately ma[d]e the decision to terminate" Knight, Poff answered that he "had to pull the trigger on the termination, but it was very strongly hinted that there would be problems if I did not do so." Asked "[h]ow was it strongly hinted," Poff explained that "[t]he area leaders would pull you into your office at the store, for example, and tell you what they wanted. If they did not get what they wanted, they would say you would be in trouble." In fact, Lee indicated to Poff that not firing Knight might cause Poff to lose his franchise. Lee candidly testified she told Poff that, " '[i]f you have anyone that works for you that is damaging the brand or going to cause you to lose your franchise agreement, that person is not

3

the person you want working for you.'  And I told him, 'Right now, Dave [Knight] is hurting your franchise.' "  Poff fired Knight a few weeks later.

This interaction between Poff and Lee provides essential context for their later interaction concerning Miranda.  Upon learning of plaintiff's allegations of harassment against Miranda, Lee told Poff, "You've got to get rid of this guy." Asked how he had answered, Poff testified that his "response always to the area leader was 'yes' or 'I'll get it done' or, you know, 'Give me a little time.'  I never said 'no' intentionally to [Lee]."  Poff could not "recall specifically" whether Lee "allude[d] to anything that would happen to [Poff] if [he] didn't fire Miranda," but it was hardly necessary for Lee to repeat the warning she had recently given Poff that the failure to follow her wishes concerning the termination of a problematic employee could lead to the loss of his franchise.  Consistently with his statement that he "never said 'no' " to Lee, Poff confirmed that he "never t[old] her over the phone or to her face that [he] did not intend to fire Miranda."  A franchisee who did not follow Lee's suggestions, Poff testified, was "out of business very quickly."  Ultimately, Miranda's failure to return to work made it unnecessary for Poff to risk the loss of his franchise by refusing Lee's demand.

Under the common law, " '[p]erhaps no single circumstance is more conclusive to show the relationship of an employee than the right of the employer to end the service whenever he sees fit to do so.' "  (*Burlingham v. Gray* (1943) 22 Cal.2d 87, 100.)  While no one factor is determinative, the power to discharge an employee offers " 'strong evidence' " both of the fact of control and of the ultimate existence of an employment relationship.  (*Kowalski v. Shell Oil Co.* (1979) 23 Cal.3d 168, 177; see *Borello*, *supra*, 48 Cal.3d at p. 350; *Tieberg*, *supra*, 2 Cal.3d at p. 949.)  This is because the employer's power to terminate the employee's services gives the employer the means of controlling the employee's activities (see *Ayala v. Antelope Valley Newspapers, Inc.* (2014) 59 Cal.4th 522,

4

531; *Malloy v. Fong* (1951) 37 Cal.2d 356, 370) and because, as a matter of logic, a person's reservation of the power to terminate another's employee "is *incompatible with the full control of the work by another*" (*National Auto. Ins. Co. v. Ind. Acc. Com.* (1943) 23 Cal.2d 215, 220, italics added).  For these purposes "[i]t is not essential that the right of control be exercised or that there be actual supervision of the work of the [employee]." (*Malloy*, at p. 370.)  "What matters is whether the hirer 'retains all *necessary* control' over its operations." (*Ayala*, at p. 531, quoting *Borello*, *supra*, at p. 357.)

In summary, if Domino's relationship with Poff gave it the power to force him to fire his employees, then those employees were subject not just to Poff's control but also to Domino's and thus were the employees of both.  Viewing the evidence in the light most favorable to plaintiff, as we must when reviewing an order granting a defense motion for summary judgment (*McDonald v. Antelope Valley Community College Dist.* (2008) 45 Cal.4th 88, 96), the record would clearly permit the trier of fact to conclude that Domino's retained and exercised that power.

As mentioned, my disagreement with the majority is not so much with its statement of the applicable law as with its application of the law to the facts.  In concluding Domino's did not have the power to force Poff to discharge his employees, the majority places too much emphasis on the terms of the franchise agreement and not enough on the parties' real world interaction.  The language of the governing contract is only "one factor to be considered in determining the nature of the employment relationship" and "is not controlling." (*Bradley*, *supra*, 158 Cal.App.4th at p. 1628.)  This is because our principal responsibility in FEHA cases is not to give effect to private contracts intended to shift or avoid liability, nor is it to promote the use of franchising as a business model or to avoid "disrupt[ing] the franchise relationship." (Maj. opn., *ante*, at p. 31.)  Instead, our

5

duty is to vindicate the Legislature's "fundamental *public* interest in a workplace free from the pernicious influence of sexism." (*Rojo v. Kliger* (1990) 52 Cal.3d 65, 90; see *Harris v. City of Santa Monica* (2013) 56 Cal.4th 203, 224 [same].) When this task requires us to construe FEHA's definition of employer, we are bound by the Legislature's command that "[t]he provisions of [FEHA] shall be construed liberally for the accomplishment of [its] purposes . . . ." (§ 12993, subd. (a).) To emphasize contractual language intended to shield a franchisor from employment-related claims over evidence the franchisor in practice retained and exercised the power to terminate the franchisee's employees tends to undermine FEHA's goals by permitting the franchisor, in effect, to opt out of the statutory duties of a California employer.

For these reasons, I dissent.

**WERDEGAR, J.**


**WE CONCUR:**


**LIU, J.**
**CHANEY, J.**[*]

---

[*] Associate Justice of the Court of Appeal, Second Appellate District, Division One, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** Patterson v. Domino's Pizza, LLC

_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 207 Cal.App.4th 385
**Rehearing Granted**

_____

**Opinion No.** S204543
**Date Filed:** August 28, 2014

_____

**Court:** Superior
**County:** Ventura
**Judge:** Barbara A. Lane

_____

**Counsel:**

Alan Charles Dell'Ario; Winer & McKenna, Alexis S. McKenna, Kelli D. Burritt and Kent F. Lowry, Jr., for Plaintiff and Appellant.

The deRubertis Law Firm, David M. deRubertis; Pine & Pine and Norman Pine for Consumer Attorneys of California as Amicus Curiae on behalf of Plaintiff and Appellant.

Kolar & Associates, Elizabeth L. Kolar; Snell & Wilmer and Mary-Christine Sungalia for Defendants and Respondents.

Seyfarth Shaw, David D. Kadue; Law Offices of Steven Drapkin and Steven Drapkin for Employers Group, California Employment Law Council and California Chamber of Commerce as Amici Curiae on behalf of Defendants and Respondents.

Reed Smith, Margaret M. Grignon and Tillman J. Breckenridge for Automobile Club of Southern California as Amicus Curiae on behalf of Defendants and Respondents.

DLA Piper, Kim Lambert, Julia Brighton and John F. Verhey for International Franchise Association and California Restaurant Association as Amici Curiae on behalf of Defendants and Respondents.

Manning & Kass, Ellrod, Ramirez, Trester and Steven J. Renick for Eleven Health Club Franchisees as Amici Curiae on behalf of Defendants and Respondents.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Alan Charles Dell'Ario
1561 Third Street, Suite B
Napa, CA  94559
(707) 666-5351

Mary-Christine Sungalia
Snell & Wilmer
600 Anton Boulevard, Suite 1400
Costa Mesa, CA  92626
(714) 427-7000