Filed 2/28/23  Schwade v. South Pasadena Rehabilitation Center LLC CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| PATRICIA SCHWADE, | B314052 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC694824) |
| v. | |
| SOUTH PASADENA REHABILITATION CENTER LLC et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Amy D. Hogue, Judge.  Affirmed.

Matern Law Group, Matthew J. Matern, Mikael H. Stahle, Kiran Prasad and Irina A. Kirnosova for Plaintiff and Appellant.

Munger, Tolles & Olson, Joseph D. Lee, Margaret G. Maraschino, Stephen A. Hylas and Jessica O. Laird for Defendants and Respondents.

_____

Following the termination of her employment by South Pasadena Care Center, LLC (Care Center) at its skilled nursing facility (the facility), plaintiff and appellant Patricia Schwade brought this action against Care Center and its owners, as well as the former owners of the facility. The former owner defendants[1] moved for summary judgment (Code Civ. Proc., § 437c), arguing that they were not plaintiff's employer. The trial court agreed and granted them summary judgment. Plaintiff appeals, contending that the trial court erred in finding that the former owner defendants were not plaintiff's joint employers.

We affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

I. *The Parties*

Rehab Center operated the facility in Pasadena on Mission Street until August 2015. Brius Management was the manager of Rehab Center before it ceased operations. Rechnitz is the chief executive officer of Brius Management and an owner of Brius, LLC, a separate entity.[2]

In August 2015, Rehab Center transferred operations of the facility to Care Center. Care Center is a separate entity from Rehab Center owned and controlled exclusively by Elliot Zemel

---

[1] The former owner defendants include defendants and respondents South Pasadena Rehabilitation Center, LLC (Rehab Center), Brius Management Co. (Brius Management), Brius, LLC, and Shlomo Rechnitz (Rechnitz).

[2] While Rehab Center had a license with the California Department of Public Health (CDPH), Rechnitz, Brius Management, and Brius were not named on the license.

2

(Zemel) and Yehuda Schmukler (Schmukler), who were not affiliated with Rehab Center.

II. *Factual Background*

    A. <u>Transfer of operations to Care Center</u>

On August 10, 2015, Rehab Center transferred "operational and financial responsibility" of the facility to Care Center pursuant to a Management and Operations Transfer Agreement (MOTA) signed by the parties. The MOTA was needed because "California law requires a license from the State Department of Public Health (CDPH) in order to operate or manage skilled nursing facilities," and Care Center had not yet obtained a license. (*California Advocates for Nursing Home Reform v. Aragón* (2021) 60 Cal.App.5th 500, 504 (*Aragón*).) The MOTA required Care Center to submit a change of ownership application with the CDPF, "pursuant to which [it would] obtain its own license," as mandated by California law.

Care Center filed its application shortly after the transfer and received a license on November 23, 2015. On that date, the MOTA expired.

While the transfer was processing, however, Rehab Center remained on the facility's license. The MOTA accordingly sought to ensure that during the transition period, the facility was operated "in compliance with the Lease and applicable law and in a manner which does not jeopardize the health and welfare of the residents of the [f]acility." To achieve these purposes, the MOTA delegated certain responsibilities to Care Center while also providing that Rehab Center had a right to "confer and consult" with Care Center on business matters related to the facility and, as the law requires, remained "ultimately responsible for the daily operational decisions and the care delivered to the residents

3

at the [f]acility," while the MOTA was in effect.[3]  The MOTA expressly provided that Rehab Center's "ultimate responsibility shall not relieve [Care Center] from its obligations" under the MOTA.

Care Center's obligations also included hiring "all employees whom [Care Center] determine[d] to be necessary to effectively and efficiently operate the [f]acility,"[4] and responsibility over "all aspects of administration of employees, including hiring, training, supervision, and termination."  Thus, the MOTA required Care Center to provide benefits, maintain payroll, issue paychecks, and withhold taxes for employees.  In contrast, the MOTA required Rehab Center to "terminate all of the [f]acility employees . . . on the day immediately prior to [August 10, 2015]."

Rehab Center adhered to this requirement and ceased all operations and terminated all of its employees on August 9, 2015. According to the former owner defendants, as of August 9, 2015, Rehab Center had no operational or financial involvement with the facility or with Care Center, and no Rehab Center employee

---

[3]  This provision parallels the basic requirements of California law.  (See, e.g., *Aragón*, *supra*, 60 Cal.App.5th at p. 510 ["the licensee is still ultimately responsible" for a facility "even if management companies are running the day-to-day operations"].)

[4]  Regarding employment, Care Center advised Rehab Center that it "intend[ed] to offer employment to at least 2/3 of the employees of the [f]acility"; "in reliance on such statements [Rehab Center and Care Center] agreed that a closure notice" would not be provided.

4

worked at or for the facility. Rather, Care Center made all decisions regarding employment at the facility after that day, including who to hire and fire.

According to plaintiff, certain text messages between Amy Johnson (Johnson), the vice president of regional operations for Rockport Healthcare Services (Rockport)[5] and the person most qualified to testify on behalf of Brius Management and Brius, and Zemel evidence the former owner defendants' continued involvement in the day-to-day operations of the facility. These text messages concern the transferring of nurses from one location to the facility. Plaintiff also contends that "Rehab Center supplied Care Center employees, including [plaintiff], with the employee handbook it had implemented when it was the sole owner and operator of the [f]acility."

B. Care Center employs plaintiff

On or about September 1, 2015, Care Center hired plaintiff to work at the facility.[6] It employed her until it terminated her employment in May 2017. During that entire period, Care Center controlled all aspects of plaintiff's employment.

---

[5] Rockport provides administrative services to various skilled nursing facilities. Johnson declared that before August 10, 2015, Rockport provided such services to Rehab Center, including its assistance with winding down Rehab Center's operations. Plaintiff's assertion that Johnson was the vice president of Rehab Center is misleading and wholly unsupported by the appellate record.

[6] At her deposition, plaintiff admitted that she does not recall communicating with anyone from Rehab Center; nor can she identify anyone who worked for Rehab Center.

### 1. *Recruitment*

In August 2015, Care Center's owners, Zemel and Schmukler, recruited plaintiff and her colleagues from an unrelated nursing facility. Care Center hired the group "as a team" after taking them on a tour of the facility.

### 2. *Hiring*

Care Center's first administrator, Dolores Diehl (Diehl), told plaintiff that she was hired. Either Diehl or Care Center's director of staff development informed plaintiff of her salary.

### 3. *Onboarding*

Care Center employees gave plaintiff a two-day orientation, during which she received policies and training materials. Those materials identify Care Center as the issuing entity.

Plaintiff later signed other documents, including Care Center's employee handbook, although plaintiff denies that she received the handbook. Plaintiff is unaware of anyone besides Care Center issuing such documents or implementing policies governing her employment.

### 4. *Supervision*

Diehl (and later, her replacement Mr. Tucker) was plaintiff's supervisor. If plaintiff had issues, such as problems with a colleague, she took them to Diehl or Mr. Tucker. She knows of nobody else she would have told of such issues.

### 5. *Pay*

Care Center collected plaintiff's time records and provided her with paychecks. These records all identify Care Center as plaintiff's employer, and plaintiff is not aware of any other entity that paid her or tracked her hours. If her paycheck did not come or she missed a meal break, she would have informed Diehl or

6

Mr. Tucker, or "the bookkeeper" who "worked for Zemel and Schmukler."

6. *Materials*

Care Center provided plaintiff with a phone, a printer-photocopier, and other supplies she used to work. It also gave her a name tag, which her Care Center supervisor required her to wear.

7. *Assignments, Scheduling, and Performance Review*

Care Center employees trained plaintiff, set her work schedule, assigned her work, responded to her time off requests, and evaluated her performance.

8. *Termination of employment*

On or around May 5, 2017, Mr. Tucker, on behalf of Care Center, terminated plaintiff's employment. Plaintiff knows of no one else involved in that decision or who had authority to terminate her.

9. *Plaintiff identifies Care Center as her employer*

After plaintiff's employment was terminated, she identified Care Center as her sole employer on an unemployment application and her resume. She never represented to a later employer that she was employed at the facility by anyone other than Care Center.

III. *Procedural History*

A. <u>Pleadings</u>

On February 16, 2018, plaintiff initiated this lawsuit, asserting individual and class claims under the Labor Code against Care Center, Zemel, and Schmukler, as well as Rechnitz, Brius Management, and Brius. A year later, she added Rehab Center as a Doe defendant.

As is relevant to the issues in this appeal, the first amended complaint, which is the operative pleading, alleges that the former owner defendants and Care Center were plaintiff's joint employers, formed an integrated enterprise, and/or were alter egos of one another during the transitionary period when plaintiff was first hired and when Rehab Center was the sole license holder.

B. Motion for summary judgment

On October 23, 2020, the former owner defendants moved for summary judgment on the ground that they were not plaintiff's employer.

C. Plaintiff's opposition

On March 2, 2021, plaintiff filed her opposition to the motion for summary judgment. Her principal contention was that there was a triable issue of fact regarding the former owner defendants' status as her employer, as an integrated enterprise and as alter egos.

Her opposition identified and discussed certain evidence, including Johnson's text messages with Zemel and copies of employee handbooks. But, plaintiff's counsel failed to attach to her declaration copies of those text messages and handbooks, both of which were exhibits to particular deposition transcripts. Plaintiff also omitted evidence supporting her claim that the former owner defendants were liable based upon theories of integrated enterprise and alter ego, even though that evidence was discussed in her opposition brief and in her supporting separate statement.

D. Reply

On March 16, 2021, the former owner defendants filed their reply brief, noting that plaintiff had failed to attach copies of

8

evidence referenced in the opposition brief and separate statement. The movants nonetheless addressed those exhibits in their reply brief, arguing why they did not raise a triable issue of material fact.

### E. Plaintiff's file a notice of errata

On April 8, 2021, the day before the scheduled hearing, plaintiff filed a notice of errata and attached the four omitted exhibits for the trial court to review. Plaintiff requested that the trial court continue the hearing on the motion "to consider the attached exhibits and provide [the former owner defendants] with the opportunity to address" them.

### F. Trial court order and judgment

At the April 9, 2021, hearing, the trial court stated that it had received the notice of errata and asked whether the former owner defendants had received the filing. Counsel responded: "And just for the purposes of putting it on the record, we do object to the newly-submitted evidence as untimely and would move to strike the notice of errata for that reason and in violation of due process rights. [¶] But we're also prepared to discuss it, Your Honor, which is why we don't think these new documents make a difference."

The trial court then inquired as to how the exhibits "would raise a triable issue of fact." Plaintiff responded that the evidence created triable issues on the former owner defendants' "rights and ability and, indeed, obligation under the law to control the operations and the management decisions" at the facility. She also contended that the MOTA evidenced Rehab Center's control over the "day-to-day operational decisions."

After taking the matter under submission, partly to review the omitted evidence, the trial court granted the former owner

9

defendants' motion.  In a 28-page order, the trial court found it undisputed that the former owner defendants did not employ plaintiff.  And, plaintiff could not show an employment relationship under a joint employer, integrated enterprise, or alter ego theory.  In so doing, the trial court sustained the former owner defendants' objection to several documents that plaintiff filed late, including an employee handbook and Johnson's text messages with Zemel.  But, the trial court went on to consider the late-filed evidence:  "Even if the documents were admissible, the Court concludes they do not raise a triable issue of whether [the former owner defendants] exercised control over [plaintiff's] wages, hours, or working conditions, suffered or permitted her to work, or engaged her."

Judgment was entered on May 18, 2021.

G. Appeal

This timely appeal ensued.

**DISCUSSION**

I. *Late-filed Evidence in Support of Plaintiff's Opposition*

The parties devote much of their appellate briefs to the question of whether the trial court properly refused to consider plaintiff's late-filed evidence.  We need not decide this issue. Notwithstanding plaintiff's argument to the contrary, it is evident from both the reporter's transcript and the trial court's lengthy and detailed minute order that it did consider the belatedly filed evidence.[7]  We too consider the evidence that was belatedly filed with the trial court.

---

[7]      Curiously, plaintiff also concedes in her opening brief that the trial court "explicitly addressed" the evidence in its order granting summary judgment.

10

II. *Trial Court Properly Granted Summary Judgment*

　　A. <u>Standard of review</u>

"Summary judgment is subject to de novo review.  To analyze the issues, 'we follow the traditional three-step analysis. "We first identify the issues framed by the pleadings, since it is these allegations to which the motion must respond.  Secondly, we determine whether the moving party has established facts which negate the opponents' claim and justify a judgment in the movant's favor.  Finally, if the summary judgment motion prima facie justifies a judgment, we determine whether the opposition demonstrates the existence of a triable, material factual issue. [Citation.]" [Citation.]' [Citation.]" (*Kaney v. Custance* (2022) 74 Cal.App.5th 201, 213.)

"In 'reviewing the trial court's decision to grant summary judgment, we liberally construe the evidence in support of the party opposing summary judgment and resolve all doubts about the evidence in that party's favor.  [Citation.]'  [Citation.]  '[W]e must draw from the evidence all reasonable inferences in the light most favorable to the party opposing summary judgment. [Citation.]'  [Citation.]" (*Kaney v. Custance, supra,* 74 Cal.App.5th at p. 213.)

　　B. <u>No evidence that the former owner defendants were plaintiff's employer</u>

As set forth above, plaintiff's claims stem from alleged violations of the Labor Code.  "[N]o generally applicable rule of law imposes on anyone other than an employer a duty to pay wages." (*Martinez v. Combs* (2010) 49 Cal.4th 35, 49 (*Martinez*).) Accordingly, to maintain each of her causes of action, plaintiff was required to show that each of the former owner defendants was her employer. (*Taylor v. Financial Casualty & Surety, Inc.*

11

(2021) 67 Cal.App.5th 966, 984 (*Taylor*); see Cal. Code Regs., tit. 8, § 11050, subd. 2(E).)

To establish an employment relationship, plaintiff was required to introduce evidence that each of the former owner defendants (1) "exercise[d] control over [her] wages, hours, or working conditions;" (2) engaged her, thereby creating a common law employment relationship; or (3) "suffer[ed] or permit[ted]" her to work. (*Martinez, supra*, 49 Cal.4th at p. 64.)

1. *None of the former owner defendants exercised control over plaintiff's wages, hours, or working conditions*

Under the "control" test, a plaintiff must show that the defendant had the right to exercise control over her employment. (See *Ayala v. Antelope Valley Newspapers, Inc.* (2014) 59 Cal.4th 522, 531.) "What matters is whether the hirer 'retains all *necessary* control' over its operations." (*Ibid*.) In *Martinez*, for example, the California Supreme Court held that farm workers were not jointly employed by produce merchants because the farmer alone "hired and fired plaintiffs, trained and supervised them, determined their rate and manner of pay . . . , and set their hours, telling them when and where to report to work and when to take breaks." (*Martinez, supra*, 49 Cal.4th at p. 72.)

The same is true here. As set forth above, Care Center alone recruited plaintiff, hired her, onboarded and trained her, set her schedule and addressed her time off requests, set workplace policies, assigned her tasks, supervised her and reviewed her performance, set her pay, provided her paychecks,

required her to wear a name tag, provided her materials to do her job, and ultimately exercised its authority to terminate her.[8]

Thus, plaintiff failed to raise a triable issue of fact regarding the "control" test. (See *Martinez, supra,* 49 Cal.4th at p. 71 [affirming summary judgment for defendant where "[t]he undisputed facts . . . show that another entity alone controlled plaintiffs' wages, hours and working conditions"]; *Curry v. Equilon Enterprises, LLC* (2018) 23 Cal.App.5th 289, 302–303 (*Curry*) [where another entity "was responsible for hiring, firing, disciplining, training, and compensating" the plaintiff-employee, "had control over [the plaintiff-employee's] wages and hours," and controlled "the tasks [the plaintiff-employee] was made to perform, and the conditions in which she performed them," the defendant "ha[d] met its burden of establishing there [was] not a triable issue of fact concerning [defendant] being [the plaintiff-employee's] employer"].)

On appeal, plaintiff suggests that a few particular documents—namely, Care Center's handbook, some mischaracterized text messages, and the MOTA[9]—created a

_____

[8] Although arguably not dispositive, we note that plaintiff specifically conceded that she could not identify any admissible evidence of any of the former owner defendants hiring her, paying her, controlling her working conditions, or suffering or permitting her to work. (See *Martinez, supra,* 49 Cal.4th at p. 76 [ "[n]o evidence suggest[ed] [the farmer's] employees viewed the field representatives as their supervisors or believed they owed their obedience to anyone but [the farmer] and his foremen"].)

[9] The MOTA is discussed at length in section 2.a., *infra.*

13

triable issue. However, none of those documents are sufficient to establish that Rehab Center or any other former owner defendant controlled plaintiff's employment.[10]

a. Handbook

At most, the record shows that Care Center used a handbook that was similar to the one Rehab Center had previously used, and that Johnson, who was never employed by Rehab Center, sent the handbook to Zemel before the sale because a "union representative asked for it." There was no evidence, however, that Rehab Center required or even suggested that Care Center use its prior policies. Thus, as the trial court correctly held, "[e]ven assuming Care Center did use Rehab Center's employee handbook, this fact does not raise a triable issue as to whether Rehab Center exercised control over [plaintiff's] wages, hours, or working conditions."

This is quite different from the cases that plaintiff cites, each of which involved an entity that imposed or enforced policies. (*Castaneda v. Ensign Group, Inc.* (2014) 229 Cal.App.4th 1015, 1022 (*Castaneda*) [parent provided "policy and training videos" that subsidiary was required to show to employees]; *Estrada v. FedEx Ground Package System, Inc.* (2007) 154 Cal.App.4th 1, 11–12 [FedEx controlled "every

_____

[10] As noted during oral argument, plaintiff often conflates the former owner defendants by referring to them collectively and generically throughout her briefs as "Defendants." She does not explain or argue how these documents demonstrate that *each* of the four former owner defendants was her joint employer.

14

exquisite detail of the drivers' performance, including the color of their socks and the style of their hair"].)

b. Text messages

Plaintiff relies heavily upon a late-2016 text message exchange between Zemel, Care Center's owner, and Johnson. Johnson is repeatedly and incorrectly described as "Rehab Center's Vice President of Operations." However, plaintiff cites no evidence that Johnson ever held this role or was ever employed by Rehab Center, and the undisputed evidence establishes that she simply was not.[11] Thus, text messages sent by Johnson do not compel a finding that Rehab Center had control over plaintiff's employment.

In any event, the text messages do not show Rehab Center exercising any control over plaintiff because the messages have nothing to do with her. Rather, they related to Care Center's recruitment of a handful of third-party nurses from an unrelated facility, over a year after plaintiff was hired and long after Rehab Center had ceased all operations.[12]

The text messages also do not show that Rehab Center had an unexercised "right" to control Care Center's employees more

[11] Johnson testified that she worked for Rockport, a separate entity that provides services to many different nursing facilities. She previously provided these services at the facility prior to its sale.

[12] Plaintiff's assertion that "the text messages showed that Rehab Center was transferring employees from its other locations to the Facility" is not supported by any evidence. In fact, plaintiff directs us to no evidence that Rehab Center ever had any other locations.

15

broadly. (See *Ayala v. Antelope Valley Newspapers, Inc.*, *supra*, 59 Cal.4th at p. 531.) Johnson's messages merely mention a "friendly agreement," and indicate to Zemel that there was one nurse from an unrelated facility that Johnson would "rather [Care Center] not take." These messages, at most, frame a request, and do not assert some control that Johnson had the authority to exercise. Nothing in the record shows that Johnson, on behalf of the former owner defendants, had power over Zemel or anyone else at Care Center over a year after the transition of operational control of the facility had been completed. In fact, Zemel testified that Care Center alone had power to determine who to hire and fire after the sale.

2. *None of the former owner defendants meets the common law test as plaintiff's employer*

The California Supreme Court has explained that under "traditional common law principles" that apply in determining whether an employment relationship exists, courts have long "emphasized 'the control exercised by the employer over the employee's performance of employment duties.'" (*Patterson v. Domino's Pizza, LLC* (2014) 60 Cal.4th 474, 499 (*Patterson*).) Like the "control" test, which is derived from the wage orders, the common law "requires 'a comprehensive and immediate level of 'day-to-day' authority' over matters such as hiring, firing, direction, supervision, and discipline of the employee." (*Ibid.*)

As with the control test, plaintiff has not introduced and cannot introduce evidence that any of the former owner defendants had control over her own "hiring, firing, direction, supervision, and discipline." (*Patterson*, *supra*, 60 Cal.4th at p. 499 [ruling that in the absence of evidence of such control, "Domino's lacked the general control of an 'employer' . . . over

16

relevant day-to-day aspects of the employment'"].)  In the absence of such evidence, none of the former owner defendants meets the common law test as plaintiff's employer.

a. <u>The MOTA does not establish that the</u><br><u>former owner defendants had control over plaintiff's employment</u>

Effectively conceding that she cannot establish actual control over her employment by any of the former owner defendants, plaintiff argues that she "was not required" to prove this element because Rehab Center had a theoretical "right to control" based on the MOTA provision giving Rehab Center "the right to confer and consult with [Care Center]" on various business "matters, concerning the operation of the [f]acility" for a few months after the facility was transferred while Rehab Center remained on the facility's license.  This argument, however, misconstrues both the terms of the MOTA as well as the common law employment test.

As an initial matter, far from granting Rehab Center a right to control employees at the facility, the MOTA assigned all such responsibility to Care Center.  It expressly provided that Rehab Center would terminate all of its own employees before the transfer occurred.  Thereafter, Care Center was responsible for hiring "all employees whom [Care Center] determine[d] to be necessary to effectively and efficiently operate the [f]acility."  The MOTA also provided that Care Center "shall be responsible for all aspects of administration of employees, including hiring, training, supervision, and termination," as well as for providing all benefits, maintaining payroll records, issuing paychecks, and withholding taxes for its employees at the facility.  Plaintiff admitted that she had no reason to believe that the terms of the MOTA "impacted [her] job duties," or her "working conditions";

17

nor could she point to any evidence showing that Rehab Center's responsibility to ensure patient care resulted in any exercise of control over her day-to-day work.

In addition, a party's contractual right to oversee or ensure quality control at a business generally is not sufficient to create a triable fact that the party exercised control over the business's employees. (See, e.g., *Curry*, *supra*, 23 Cal.App.5th at pp. 294, 304; *Salazar v. McDonald's Corp.* (9th Cir. 2019) 944 F.3d 1024, 1029–1030 [holding that McDonald's did not employ its franchisee's employees because, although it had the ability to provide oversight and quality control of its franchisee's restaurants, it did "not retain 'a general right of control' over 'day-to-day aspects' of work at the franchises," and its "involvement in its franchises and with workers at the franchises . . . [did] not represent control over wages, hours, or working conditions"]; *Henderson v. Equilon Enterprises, LLC* (2019) 40 Cal.App.5th 1111, 1115–1116, 1121, 1123.)

The cases cited by plaintiff prove the same point. For example, in *Medina v. Equilon Enterprises, LLC* (2021) 68 Cal.App.5th 868, 878 (*Medina*), the court found a joint employment relationship based upon significant evidence of the putative joint employer's power to control beyond its contractual right to oversee or ensure quality control: the plaintiff testified that the putative joint employer's trainers had directly threatened to fire him and had caused other station operators to be fired. In other words, there was direct control over the plaintiff's employment. The contract also set forth "extremely detailed technical instructions" that were mandatory for station owners. (*Id.* at p. 879.)

18

In contrast here, there is no evidence of the former owner defendants' control over plaintiff's employment. And, the terms of the contract in *Medina* are a far cry from Rehab Center's mere ability to "confer and consult" under the MOTA.

*Mattei v. Corporate Management Solutions, Inc.* (2020) 52 Cal.App.5th 116 (*Mattei*) is also distinguishable. That case involved a collective bargaining agreement where the signatory (CMS) lent its status to a third party to allow the third party to hire union crewmembers. (*Id.* at p. 120.) CMS was a defined employer under the terms of the collective bargaining agreement and bound to pay its employees on a timely basis. (*Id.* at p. 121.) Nothing in the collective bargaining agreement "relieve[d] signatories of their responsibility . . . when they 'len[t]' their signatory status to a nonsignatory." (*Id.* at p. 126.) Under these circumstances, "CMS remained an employer with all concomitant responsibilities imposed by that agreement." (*Id.* at p. 127.)

There was also evidence of CMS participating in hiring decisions, listing jobs associated with the production with the call steward, identifying itself as a "joint producer," administering payroll, and collecting and paying union dues on behalf of employees. (*Mattei, supra,* 52 Cal.App.5th at p. 128.)

Here, in contrast, the MOTA is not vague as to which entity is responsible for employees, but rather expressly delegates "all aspects" of administering employees to Care Center. There is no agreement that adheres the former owner defendants to plaintiff in any way.

Furthermore, no such evidence of actual control by Rehab Center exists. In fact, other than repeatedly citing a single MOTA provision providing for the right to "confer and consult," plaintiff points to no evidence showing that Rehab Center had a

right to control her employment. As the trial court correctly explained, she only put forth the handbook and the text messages, which, as set forth above, do not create a triable issue that Rehab Center controlled her employment.

              b.  <u>State licensing regulations did not give Rehab Center the right to control plaintiff's employment</u>

The trial court also properly rejected plaintiff's argument that Rehab Center's obligation to comply with patient care regulations as the facility's licensee somehow transformed Rehab Center into the "employer" of all individuals who performed services at the facility.

The Fifth District rejected a similar argument in a different regulatory context in *Taylor*, *supra*, 67 Cal.App.5th at page 979. There, the plaintiffs argued that a surety that contracted with their direct employer, a bail bond company named Hotline, jointly employed them because it retained certain regulatory responsibilities, such as facing penalties if a defendant failed to appear in court, and took actions related to those responsibilities, such as performing audits, "ensur[ing] bond paperwork was in order," and seeking "status updates [from Hotline] on forfeitures." (*Id.* at pp. 989, 993, 1003.) The *Taylor* court held that nothing in the regulations or contracts between Hotline and the surety gave the surety "the right to control the means and manner of Hotline's employees day-to-day work." (*Id.* at pp. 993, 996.) Rather, the contracts gave Hotline "'exclusive control' over its agency and employees" (*id.* at p. 992), and there was no evidence "demonstrating [the surety] had input into the hiring, firing, or payment of fugitive recovery personnel, dictated how such personnel accomplished their work, or supervised that work." (*Id.* at p. 1003.)

20

The same is true here. The regulations cited by plaintiff show only that while it was named on the license, Rehab Center retained responsibility for ensuring a lawful level of patient care. (See *Taylor*, *supra*, 67 Cal.App.5th at p. 989.) These regulatory duties, however, did not give Rehab Center control over Care Center's employees. (See *id*. at p. 998.) Like the contract in *Taylor*, the MOTA also disavows Rehab Center's control over employees, instead expressly delegating that responsibility to Care Center.

Plaintiff incorrectly argues that Rehab Center was not permitted to delegate its responsibility under California Code of Regulations, title 22, section 72501 to provide adequate personnel to ensure patient care. (See *Aragón*, *supra*, 60 Cal.App.5th at pp. 511–512 [a licensee may lawfully delegate management of the "day-to-day operations" of a skilled nursing facility to a management company].)

In any event, plaintiff's argument that a licensee's duties are "nondelegable" has no bearing on employer status. As the trial court correctly explained, Rehab Center's nondelegable duties related to its potential liability "in a private action under the patients' bill of rights," not in a private action by Care Center's employees under the Labor Code. (See, e.g., *California Assn. of Health Facilities v. Department of Health Services* (1997) 16 Cal.4th 284, 302.)

Plaintiff's contention that Rehab Center had the "*motive*" to control Care Center's employees is equally irrelevant. Not only did plaintiff fail to raise this argument below (*Mundy v. Lenc* (2012) 203 Cal.App.4th 1401, 1406 [failure to raise a point in the trial court constitutes a waiver on appeal]), but she cites no California law that confers "employer" status on an entity that

21

could be "motivated" to care about the performance of another entity's employees. (*Benach v. County of Los Angeles* (2007) 149 Cal.App.4th 836, 852.)

Citing *Medina, supra*, 68 Cal.App.5th 868, plaintiff argues that Rehab Center imposed "extremely detailed technical instructions" regarding patient care on workers at the facility based on various state regulations that apply to skilled nursing facilities. But nothing in *Medina* suggests that the existence of state-imposed regulations governing the operation of a nursing facility can establish the requisite control over that facility's workers and establish an employment relationship—especially when the law provides that a licensee subject to those regulations may retain a management company to operate its facility, which can, in turn, hire its own employees. (See *Aragón, supra*, 60 Cal.App.5th at p. 504.)

Finally, *Guerrero v. Superior Court* (2013) 213 Cal.App.4th 912 does not compel a different result. In that case, the petitioner was employed to provide in-home support services to eligible recipients in Sonoma County (County) under the In-Home Support Services Act (IHSS). (*Id*. at p. 917.) She was not paid for services she rendered to a program recipient, "despite a comprehensive scheme of federal and California statutes, implemented within the County through enactment of local ordinances that spell out the responsibilities of County and the Sonoma County In-Home Supportive Services Public Authority (Public Authority) for establishing and monitoring IHSS providers' wages, hours, and conditions of employment." (*Ibid*.) The petitioner filed suit against the County and Public Authority; they demurred, and the trial court sustained their demurrer without leave to amend on the grounds that the County and

Public Authority were not her employers or joint employers. (*Id.* at pp. 917–918.)

The Court of Appeal held that the trial court erred. (*Guerrero v. Superior Court*, *supra*, 213 Cal.App.4th at p. 918.) The court reasoned that because the County and Public Authority exercised considerable control over the structure and conditions of the petitioner's employment, the petitioner's pleading survived the demurrer stage of the litigation. (*Id.* at pp. 937, 949.)

Here, in contrast, there is no comprehensive legislative scheme (or anything for that matter) that gives the former owner defendants control over the conditions of plaintiff's employment. And there is no evidence that they exercised any such control.

3. N*one of the former owner defendants suffered or permitted plaintiff to work*

Finally, the trial court correctly found that plaintiff did not establish a triable issue under the "suffer or permit" test. "[T]he basis of liability" under this test "is the defendant's knowledge of and *failure to prevent* the work from occurring." (*Martinez*, *supra*, 49 Cal.4th at p. 70; see also *Futrell v. Payday California, Inc.* (2010) 190 Cal.App.4th 1419, 1434 [defendant was not the plaintiff's employer because there was no evidence that it "had the power to either cause him to work or prevent him from working"].)

Plaintiff did not address the "suffer or permit" test in the trial court and has never before suggested that the former owner defendants had the ability to "block" plaintiff from working. Setting that procedural obstacle aside, the undisputed evidence establishes that the former owner defendants were unable to prevent plaintiff from working because, as set forth above, Rehab

Center ceased operations before plaintiff started working and had no authority over plaintiff's schedule or work.

Plaintiff continues to rely upon Johnson's text messages, arguing that they establish Rehab Center's authority to prevent Care Center's employees from working. But nothing in these text messages suggests that Johnson or Rehab Center had such authority.

Plaintiff also argues that the "suffer or permit" test is intended to reach "sham arrangements" where the actual employer is a "straw man," suggesting that there was some sort of sham arrangement here. However, plaintiff cites no evidence of a sham or that shows that Care Center is not a legitimate employer. Rather, the undisputed evidence establishes that the parties entered into the MOTA so that Rehab Center could delegate to Care Center the responsibility to manage the facility through a common, valid, and enforceable type of management agreement. (See *Aragón*, *supra*, 60 Cal.App.5th at p. 504.)

C. Plaintiff failed to present a triable issue as to integrated enterprise

Initially, we note that the parties dispute whether plaintiff may rely upon the integrated enterprise theory. Assuming that an integrated enterprise argument is available, "an employee who seeks to hold" an entity liable for another entity's actions under an integrated enterprise theory bears a "heavy burden" to show that the entities, which are "presumed to have separate existences," in fact "constitute a single employer." (*Laird v. Capital Cities/ABC, Inc.* (1998) 68 Cal.App.4th 727, 737 (*Laird*), criticized on other grounds by *Reid v. Google, Inc.* (2010) 50 Cal.4th 512.) To meet that burden, plaintiff was required to satisfy four prongs: (1) interrelation of operations; (2) common

24

management; (3) common ownership or financial control; and (4) centralized control of labor relations. (*Ibid*.) Plaintiff did not present evidence meeting any of them.

1. *No evidence showing interrelation of operations*

The interrelation of operations prong requires plaintiff to show """"a degree"""" of control of Care Center's operations """"that exceeds the control normally exercised by a parent corporation"""" over a subsidiary. (*Maddock v. KB Homes, Inc.* (C.D. Cal. 2007) 631 F.Supp.2d 1226, 1239 (*Maddock*).) Factors include whether a parent company "kept [the subsidiary's] books, issued its paychecks, or paid its bills," and whether the companies had shared employees, headquarters, or office space. (*Laird*, *supra*, 68 Cal.App.4th at p. 739.)

None of these factors is present here. Not only are the former owner defendants not a parent entity to Care Center, but plaintiff offers no evidence that any of the former owner defendants kept Care Center's books, issued its paychecks, or paid its bills.[13] Indeed, after Rehab Center ceased operations on August 9, 2015, it "neither had employees nor shared employees with Care Center," "did not share offices with Care Center," did

---

[13] Plaintiff claims that "Rehab Center presumably 'paid the bills' 'since the MOTA provided for it to "ensure that 'the levels of supplies and inventory at the Facility, including without limitation, perishable food, non-perishable food, central supplies linen, housekeeping and other supplies' met requirements 'under applicable law.'" This argument omits the adjacent language providing that Rehab Center was only obligated to supply the facility on the day it was initially transferred to Care Center ("on the Operations Transfer Date").

25

not "receive any revenue from Care Center's operations," and had no "access to Care Center's financial information."

Plaintiff's argument that Rehab Center shared addresses with Care Center because a corporate form listed the Mission Street address is purely conclusory and unsupported by evidence. The form does not show that Rehab Center operated out of that address after selling the facility to Care Center.[14] And, while shared addresses can be a factor supporting interrelation of operations, the cases plaintiff cites involved significant additional evidence of interrelated operations not present here. (See *Perry Farms, Inc. v. Agricultural Labor Relations Bd.* (1978) 86 Cal.App.3d 448, 465 [owner owned "all stock" in subsidiary, "ma[de] all of the material decisions" for it, and "establish[ed] and negotiate[d] the deals in which the two corporate entities participate[d]"]; *Taylor v. Shippers Transport Express, Inc.* (C.D. Cal., Sept. 30, 2014, No. CV 13-02092 BRO (PLAx)) 2014 U.S. Dist. Lexis 180061 [one company managed the other's accounts payable, accounts receivable, and payroll]; *Van Norman v. Harman Management Corp.* (N.D. Cal., July 6, 1995, No. C93-2880 MHP) 1995 U.S. Dist. Lexis 9970 [one company kept the other's books and personnel records and issued its paychecks].)

Finally, plaintiff contends that Johnson's text messages "showed that Rehab Center was transferring employees from its other locations to the Facility" without citing any evidence that Rehab Center had any other locations. Not only is there no evidence of such "other locations," but, as set forth above,

---

[14]     Johnson testified at her deposition that she had no reason to believe that Rehab Center maintained a business at the facility address, now owned and operated by Care Center. She guessed that the address on the form was a "typo."

plaintiff merely speculates that Johnson's messages were sent on behalf of Rehab Center, which, at that time, had ceased all operations.  (See *Silva v. See's Candy Shops, Inc.* (2016) 7 Cal.App.5th 235, 246 ["An 'issue of fact . . . is not created by "speculation, conjecture, imagination or guess work"'"], overruled in part on other grounds in *Donohue v. AMN Services, LLC* (2021) 11 Cal.5th 58, 77.)

### 2.  *No evidence of common ownership, management, or financial control*

Even though common ownership is "never enough" on its own, it is typically required of an integrated enterprise.  (*Laird*, *supra*, 68 Cal.App.4th at p. 738.)  As the trial court correctly found, there is no common ownership here.[15]  Since its inception, Care Center has been solely and exclusively operated, maintained and controlled by Zemel and Schmukler.  Zemel and Schmukler have no ownership interest in any of the former owner defendant entities.  Likewise, Rechnitz has no ownership interest in Care Center; neither do Brius Management, Brius, or Rehab Center.  Plaintiff even admitted that she has "no information" related to the alleged business relationships between the former owner defendants and Care Center.

---

[15]     Plaintiff argues that a sublease agreement, under which Care Center subleased the facility to Rehab Center while the MOTA was in effect somehow shows common ownership or management.  But, as the sublease provides, Care Center entered into that agreement so Rehab Center would "remain in legal possession of the [f]acility so that [Rehab Center's] license to operate the [f]acility [would] remain in effect."  That does not show that the former owner defendants and Care Center had ownership or management in common.

27

Urging us to find a triable issue of fact, plaintiff again relies upon mischaracterized text messages and a claim that Rehab Center was obligated to provide the facility with supplies. But she cannot dispute that Care Center has never shared managers with any of the former owner defendants. Plaintiff reported to Diehl and Mr. Tucker, who worked exclusively for Care Center. And as noted above, none of the former owner defendants had any financial control over Care Center—Rehab Center did not "receive any revenue from Care Center's operations," and had no "access to Care Center's financial information."

3. *No evidence of centralized control of labor relations*

The last prong, centralized control of labor relations, requires plaintiff to show that the former owner defendants "control[led] the day-to-day employment decisions of" Care Center and "made the final decisions regarding employment matters related to [plaintiff]." (*Laird*, *supra*, 68 Cal.App.4th at p. 738.) The trial court correctly concluded that plaintiff did not show this factor. After all, the evidence shows that Care Center alone controlled plaintiff's day-to-day employment.

Other than continuing to mischaracterize Johnson's text messages, plaintiff again points to Rehab Center's obligations under the MOTA as evidence of centralized control. But a general right to oversee operations is insufficient to show control over plaintiff's day-to-day employment. (See *Maddock*, *supra*, 631 F.Supp.2d at p. 1242 ["evidence that KB Home provided unspecified guidance to management personnel . . . and helped them to complete a 'strategic plan' does not demonstrate that KB Home had any involvement in the day-to-day personnel decisions"].)

28

D.  Plaintiff failed to present a triable issue as to her alter ego theory

Alter ego is "an extreme remedy, sparingly used."  (*Sonora Diamond Corp. v. Superior Court* (2000) 83 Cal.App.4th 523, 539 (*Sonora Diamond*).)  Courts invoke the doctrine only in "narrowly defined circumstances" where "one corporation uses another to perpetrate fraud, circumvent a statute, or accomplish some other wrongful or inequitable purpose."  (*Gopal v. Kaiser Foundation Health Plan, Inc.* (2016) 248 Cal.App.4th 425, 431.)  Establishing liability based on an alter ego theory—to the extent such a theory is even cognizable[16]— requires that the plaintiff demonstrate two essential elements:  (1) "a unity of interest and ownership . . . [such] that the separate personalities of the corporation and the [individual] do not in reality exist," and (2) "an inequitable result if the acts in question are treated as those of the corporation alone."  (*Sonora Diamond*, *supra*, 83 Cal.App.4th at pp. 538–539.)  Without evidence of these elements, "the alter ego doctrine cannot be invoked."  (*Id.* at p. 539.)

Here, plaintiff adduced no evidence of legal or equitable ownership, which is dispositive on its own.  (*SEC v. Hickey* (9th Cir. 2003) 322 F.3d 1123, 1128 ["[o]wnership is a pre-requisite to alter ego liability, and not a mere 'factor' or 'guideline'"].)

Even if common ownership were not required, plaintiff's contention that Care Center is a "mere instrumentality" of Rehab Center is without merit.  That standard "envisions pervasive

---

[16]    As the trial court acknowledged, the doctrine may not apply to Labor Code claims because the statutory scheme is broad enough to impose liability on "other persons."  (See *Atempa v. Pedrazzani* (2018) 27 Cal.App.5th 809, 824–826.)  We express no opinion on this issue.

control" that "'dictates every facet of the subsidiary's business—from broad policy decisions to routine matters of day-to-day operation.'" (*Ranza v. Nike, Inc.* (9th Cir. 2015) 793 F.3d 1059, 1073 (*Ranza*).) Plaintiff did not provide any such evidence. She cannot show that Rehab Center and Care Center disregarded corporate formalities or commingled funds. (See *Sonora Diamond, supra*, 83 Cal.App.4th at p. 538 [listing factors].) Instead, she cites only the same evidence—the MOTA, the corporate form, the mischaracterized text messages, and the fact that Care Center chose to use Rehab Center's prior handbook. None of these documents show that Rehab Center had any control over Care Center at all, much less that it dictated every facet of its business.

Plaintiff fares no better on the second prong. She presents no evidence there would be an "inequitable result" if her sole employer, Care Center, is treated as such. (*Sonora Diamond, supra*, 83 Cal.App.4th at p. 538.) Her only argument is that California's wage-and-hour laws are important as a matter of public policy. But no public policy supports requiring entities to pay people they did not employ. And the type of case has no effect on the alter ego analysis—the "'"requisite element of fraud under the alter ego theory must come from an inequitable use of the corporate form itself as a sham, and not from the underlying claim."'" (*MacRae v. HCR Manor Care Services, LLC* (C.D. Cal., Sept. 14, 2017, No. SA CV 14-0715 DOC (RNB)) 2017 U.S. Dist. Lexis 226097 p. *13.)

30

**DISPOSITION**

The judgment is affirmed. The former owner defendants are entitled to costs on appeal.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.

_____, Acting P. J.
ASHMANN-GERST

We concur:

_____, J.
CHAVEZ

_____, J.
HOFFSTADT